RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0127p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

MELISSA WILSON et al.,

　　　　　　　　　*Plaintiffs-Appellees,*

　　*v.*

DARIN GORDON et al.,

　　　　　　　　　*Defendants-Appellants.*

No. 14-6191

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:14-cv-01492—Todd J. Campbell, Chief District Judge.

Argued:  June 18, 2015

Decided and Filed:  May 23, 2016

Before:  MOORE, SUTTON, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Michael W. Kirk, COOPER & KIRK, PLLC, Washington, D.C., for Appellants. Samuel Brooke, SOUTHERN POVERTY LAW CENTER, Montgomery, Alabama, for Appellees.  **ON BRIEF:**  Michael W. Kirk, COOPER & KIRK, PLLC, Washington, D.C., Linda A. Ross, Carolyn E. Reed, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellants.  Samuel Brooke, Sara Zampierin, SOUTHERN POVERTY LAW CENTER, Montgomery, Alabama, Jane Perkins, Elizabeth Edwards, NATIONAL HEALTH LAW PROGRAM, Carrboro, North Carolina, Gordon Bonnyman, Jr., Christopher E. Coleman, TENNESSEE JUSTICE CENTER, Nashville, Tennessee, for Appellees.  Mark B. Stern, Alisa B. Klein, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae.

　　MOORE, J., delivered the opinion of the court in which WHITE, J., joined.  SUTTON, J. (pp. 31–33), delivered a separate dissenting opinion.

1

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.   Eleven named plaintiffs, residents of Tennessee who applied for Medicaid ("Plaintiffs"), filed a class action complaint for declaratory and injunctive relief against Darin Gordon, the Director of the Bureau of TennCare, Larry Martin, the Commissioner of the Department of Finance and Administration, and Dr. Raquel Hatter, the Commissioner of Human Services (collectively "the State"), alleging that the delays Plaintiffs have experienced in receiving eligibility determinations on their Medicaid applications violate 42 U.S.C. § 1396a(a)(8) of the Medicaid statute, and that the State's failure to provide a fair hearing on their delayed applications violates § 1396a(a)(3) and the Due Process Clause of the United States Constitution.   The district court certified a class and granted Plaintiffs' motion for a preliminary injunction, which requires the State to grant a fair hearing on delayed applications to class members who request one.   The State now appeals the grant of the preliminary injunction, but has not appealed the class certification order.   For the reasons set forth below, we **AFFIRM** the district court's grant of a preliminary injunction.

## I.  BACKGROUND

### A.  Factual Background

The Medicaid statute requires that states electing to participate in Medicaid "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8).  Regulations implementing the statute provide that "the determination of eligibility for any applicant may not exceed" 90 days for those "who apply for Medicaid on the basis of disability" and 45 days for all other applicants.  42 C.F.R. § 435.912(c)(3).   The Medicaid statute additionally requires that states must "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness." 42 U.S.C. § 1396a(a)(3); 42 C.F.R. § 431.220(a)(1) ("The State agency must grant an

opportunity for a hearing to . . . [a]ny applicant who requests it because his claim for services is denied or is not acted upon with reasonable promptness."). Where a hearing concerns a delayed application, "[t]he hearing must cover . . . [a]gency action or failure to act with reasonable promptness on a claim for services, including both initial and subsequent decisions regarding eligibility." 42 C.F.R. § 431.241(a). Moreover, a state is required to designate a "single State agency to administer or to supervise the administration of the plan." 42 U.S.C. § 1396a(a)(5). Tennessee's Medicaid program is known as TennCare and is administered by the Bureau of TennCare, which is within the Department of Finance and Administration. R. 52 (Gordon Decl. ¶ 1) (Page ID #660).

The Affordable Care Act ("ACA") introduced several changes to federal law that affected Medicaid. First, the ACA required the creation of Exchanges, state-specific health insurance marketplaces where individuals can compare and purchase private insurance plans. 42 U.S.C. § 18031. States were required either to create their own Exchange by January 1, 2014, or to allow the federal Centers for Medicare and Medicaid Services ("CMS") to operate an Exchange in the state. *Id.* §§ 18031(b)(1); 18041(b) & (c); 18083(a). Second, states must now use a standard methodology to calculate income eligibility for most categories of Medicaid, called "modified adjusted gross income" ("MAGI").[1] *Id.* § 1396a(e)(14).

Third, states must use a single, streamlined application for state health insurance and subsidy programs, including Medicaid and Children's Health Insurance Program ("CHIP"). *Id.* § 18083(b)(1)(A); § 1396w-3(b)(3). Fourth, states are required to develop an electronic system for data exchange that enables information on the application to be checked against data available electronically from federal agencies like the Internal Revenue Service ("IRS") and the Social Security Administration ("SSA"). *Id.* § 18083(c). CMS has established the Federal Data Services Hub as "a single repository for all federal data that may be useful in verifying Medicaid eligibility." R. 55 (Purcell Decl. ¶ 4) (Page ID #708).

---

[1]Two categories of Medicaid relevant to this litigation that do not use the MAGI methodology are Tennessee's CHOICES program for long-term care services for individuals 65 and over and disabled individuals 21 and older, and its Medicare Savings Program ("MSP"), which helps individuals pay for Medicare. R. 55 (Purcell Decl. at 2–3) (Page ID #705–06); 42 U.S.C. § 1396a(e)(14)(D)(i).

Fifth, the ACA created a "no wrong door" policy, meaning that individuals can apply for health coverage with the streamlined application through the state Medicaid agency, the state CHIP agency, or the Exchange. 42 U.S.C. § 18083(b)(1)(A)(iii). Thus, states must actually have a system in place for accepting streamlined applications directly. *See also* 42 C.F.R. § 435.907(a) (stating that "the agency *must* accept an application" for Medicaid) (emphasis added). States must provide applicants the option to apply online, by telephone, by mail, or in person. 42 U.S.C. § 18083(b)(1)(A)(ii); 42 C.F.R. § 435.907(a). Applicants to the Exchange found eligible for Medicaid or CHIP must be enrolled in the applicable program, and applicants to a state agency who are found ineligible for Medicaid or CHIP must be screened for eligibility for Exchange plans, and enrolled if found eligible. 42 U.S.C. §§ 1396w-3(a) & (b)(1)(C), 18083(a). Finally, when receiving Medicaid determinations from the federal Exchange, states may elect to be either a "determination" state, meaning that the state will accept CMS's final eligibility determination, or an "assessment" state, meaning that CMS's determination is preliminary and the state can accept or change it. 42 C.F.R. §§ 431.10(c)(1)(i), 435.1200(c) & (d); 45 C.F.R. § 155.302(b).

The ACA required states to accept and process all Medicaid applications using the MAGI methodology by October 1, 2013, regardless of whether the state operates its own Exchange. 42 U.S.C. § 18083(b) & (c); 42 C.F.R. § 435.907(a); R. 4-1 (Ltr. from Mann to Gordon at 2) (Page ID #297). Tennessee informed CMS in 2013 that it could not update its pre-ACA computer system for processing Medicaid applications to perform MAGI calculations by this deadline. R. 4-1 (Tennessee Mitigation Plan at 1) (Page ID #274). Thus, the State proposed temporarily to redirect all MAGI-based applicants to the federal Exchange rather than accepting the applications itself through December 2013. *Id.* Tennessee also opted to be a determination state. *Id.* CMS approved this mitigation plan on August 16, 2013 as a "short-term measure, not a long-term solution." R. 4-1 (Ltr. from Kahn to Gordon at 1) (Page ID #263); R. 4-1 (Ltr. from Mann to Gordon at 3) (Page ID #298). However, Tennessee did not meet the January 1, 2014 deadline, and at the time this appeal was filed the State had not yet successfully created a new computer system to process MAGI-based applications, called the TennCare Eligibility Determination System ("TEDS"). R. 4-1 (Contract at 4) (Page ID #261); TennCare, *Tennessee to Go in New Direction for Medicaid Eligibility Determination System* (Jan. 12, 2015),

http://news.tn.gov/node/13420.  Thus, Tennessee continues to refer all MAGI-based applicants to the Exchange.  R. 4-1 (Tennessee Mitigation Plan at 1) (Page ID #274).  Tennessee continues to process directly applications for non-MAGI categories of Medicaid.  R. 55 (Purcell Decl. ¶ 10) (Page ID #711–12).

**B.  Procedural History**

The eleven named plaintiffs are residents of Tennessee who applied for Medicaid in Tennessee and did not receive a final determination of their eligibility within the requisite time periods, and who were not provided hearings on their delayed applications when requested.  R. 1 (Compl. at 22–32) (Page ID #22–32).  Plaintiffs' applications were pending anywhere from 146 to 194 days as of the day the case was filed.  R. 1-1 to 1-8 (Decls.) (Page ID #41–71).  On July 23, 2014, Plaintiffs filed a class action complaint for declaratory and injunctive relief against Darin Gordon, the Director of the Bureau of TennCare, Larry Martin, the Commissioner of the Department of Finance and Administration, and Dr. Raquel Hatter, the Commissioner of Human Services (collectively referred to as "the State").  R. 1 (Compl. at 1, 37–38) (Page ID #1, 37–38).  Plaintiffs allege that the delays they experienced in receiving eligibility determinations on their Medicaid applications violate 42 U.S.C. § 1396a(a)(8), and the State's failure to provide a fair hearing on their delayed applications violates § 1396a(a)(3) and the Due Process Clause of the United States Constitution.  *Id.* at 35–37 (Page ID #35–37).  The same day, Plaintiffs filed a motion for class certification and a motion for a preliminary injunction.  R. 2 (Mot. for Class Cert.) (Page ID #76); R. 4 (Mot. for Prelim. Inj.) (Page ID #172–73).

The district court held a hearing on the motions on August 29, 2014.  R. 93 (Mot. Hr'g Tr.) (Page ID #1345–1456).  However, as of the day before the hearing, the State had enrolled all eleven named plaintiffs, as well as many of the 100 other class members identified by Plaintiffs, in TennCare.  *Id.* at 80–82 (Page ID #1424–26).  On September 2, 2014, the district court granted both of Plaintiffs' motions.  R. 90 (Order re: Class Cert.) (Page ID #1271–79); R. 91 (Order re: Prelim. Inj.) (Page ID #1280–88).  The district court certified the following class:

> All individuals who have applied for Medicaid (TennCare) on or after October 1, 2013, who have not received a final eligibility determination in 45 days (or in the case of disability applicants, 90 days), and who have not been given the

opportunity for a "fair hearing" by the State Defendants after these time periods have run.

R. 90 (Order re: Class Cert. at 8) (Page ID #1278). The State has <u>not</u> appealed this order. The district court granted the following preliminary injunction:

> The Defendants are enjoined from continuing to refuse to provide "fair hearings" on delayed adjudications, as required by 42 U.S.C. §§ 1396a(a)(3), (8) and 42 C.F.R. § 435.912(c)(3). More specifically, based on these provisions, and the Fourteenth Amendment Due Process Clause, the Defendants are ordered to provide the Plaintiff Class with an opportunity for a fair hearing on any delayed adjudication. Any fair hearing shall be held within 45 days after the Class Member requests a hearing and provides the Defendants with proof that an application for medical assistance was filed (or the hearing shall be held within 90 days after that date, if the application was based on disability).
>
> "Delayed adjudication," for purposes of this injunction, means an adjudication that has not occurred within 90 days after the filing of an application for Medicaid on the basis of disability, and within 45 days after the filing of all other Medicaid applications.

R. 91 (Order re: Prelim. Inj. at 8–9) (Page ID #1287–88) (footnote omitted). The State filed a timely notice of appeal of this order. R. 97 (Notice of Appeal) (Page ID #1481).

## II. JURISDICTION: This Case Is Not Moot.

A core tenet of Article III is that "federal courts may adjudicate only actual, ongoing cases or controversies." *Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 595 (6th Cir. 2014) (internal quotation marks omitted). The Supreme Court has explained that a case may become moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome," sometimes referred to as "the personal stake requirement." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396, 410 (1980) (internal quotation marks omitted). When class actions are involved, however, the Supreme Court has explained that "the Art. III mootness doctrine" is "flexible." *Id.* at 400. And unlike plaintiffs proceeding individually, "[a] class representative has two legally cognizable interests: 'One is the claim on the merits; the other is the claim that he is entitled to represent a class.'" *Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 528 (D.C. Cir. 2006) (quoting *Geraghty*, 445 U.S. at 402).

The parties do not dispute that all eleven named plaintiffs' individual claims became moot before the district court certified the class. The general rule is that "[*o*]*nce a class is certified,* the mooting of the named plaintiff's claim does not moot the action, the court continues to have jurisdiction to hear the merits of the action if a controversy between any class member and the defendant exists." *Brunet v. City of Columbus*, 1 F.3d 390, 399 (6th Cir. 1993) (emphasis in original). This is because once a class is certified, "the class of unnamed persons described in the certification acquire[s] a legal status separate from the interest asserted by" the named plaintiff. *Sosna v. Iowa*, 419 U.S. 393, 399 (1975). "Where, on the other hand, the named plaintiff's claim becomes moot *before* certification," the ordinary rule is that "dismissal of the action is required." *Brunet*, 1 F.3d at 399 (emphasis in original). However, there are exceptions to the general rule.

In its class certification order (again, not appealed by the State), the district court addressed this issue as part of its consideration of whether Plaintiffs would be adequate representatives of the class. R. 90 (Order re: Class Cert. at 5) (Page ID #1275). The district court held that three exceptions to the mootness doctrine applied—the "capable of repetition, yet evading review" exception, the "inherently transitory" exception, and the "picking off" exception. *Id.* at 6–7 (Page ID #1276–77).

The State argues that the district court erred in applying these exceptions to mootness, and adds an additional reason for finding this case moot: that Plaintiffs voluntarily released their claims. We evaluate these arguments below, and ultimately conclude that this case is not moot.

**A. The Parties' Joint Motion Did Not Render This Action Moot.**

The State argues that by agreeing to withdraw their motion for expedited briefing on the class certification and preliminary injunction motions in exchange for the State's promise "to specially process the TennCare applications of the named plaintiffs and up to 100 total applications identified by Plaintiffs' counsel as having been delayed," Appellant Br. at 19–20, Plaintiffs "voluntarily relinquished" their claims, *Pettrey v. Enter. Title Agency, Inc.*, 584 F.3d 701, 705 (6th Cir. 2009), thereby mooting the case. We do not think that Plaintiffs voluntarily

relinquished their claims by agreeing to this process, even though Plaintiffs' received relief as a consequence.

On July 28, 2014, the parties submitted a "Joint Motion to Enter a Scheduling Order on Plaintiffs' Motions for a Preliminary Injunction and for Class Certification." R. 24 (Jt. Mot.) (Page ID #370–72). Plaintiffs had previously filed a motion for an expedited hearing on these motions on July 23, 2014. R. 6 (Mot. to Expedite Hr'g) (Page ID #330–37). The Joint Motion states that "[b]ased on the State's agreement to take certain actions to alleviate the immediate concerns of the Plaintiffs, Plaintiffs respectfully withdraw their motion for an expedited hearing . . . and along with the State, respectfully request that the Court grant the State until August 14, 2014 to file its responses to the motion for class certification and a preliminary injunction." R. 24 (Jt. Mot. ¶ 2) (Page ID #370–71). The Joint Motion concludes, however, that "[t]he Plaintiffs continue to request an oral argument on the motions for preliminary injunction and class certification as promptly as possible after the 14th." *Id.* ¶ 4 (Page ID #371).

Declarations submitted by both parties further flesh out what actions the State agreed to take. Kim Hagan, the Eligibility Policy Administrator for the TennCare Division of Member Services, explained that "the State . . . agree[d] to provide individualized help for the named Plaintiffs and up to 100 total applications that Plaintiffs' counsel would bring to the State's attention to see if the State could resolve their applications." R. 53 (Hagan Decl. ¶¶ 1, 12) (Page ID #667, 672). Specifically, the State agreed to take two actions. "[F]or those named Plaintiffs who were newborn children of non-TennCare mothers, the State agreed to immediately provide Plaintiffs' counsel with an application for a new presumptive eligibility program for newborns the State is working with CMS to get approved and that the State has decided to implement in anticipation of that approval. Upon return of that application, the State agreed to enroll any newborn found eligible." *Id.* ¶ 12 (Page ID #672). "The State also agreed to ask CMS to provide [it] with the individual case files of the other named Plaintiffs so that [it could] review those files and attempt to resolve any discrepancies . . . that might be holding up a final adjudication of eligibility by the federal exchange and to provide a final decision on those Plaintiffs' eligibility." *Id.* The Joint Motion did not address attorney fees and costs.

The plain terms of the Joint Motion did not settle the case. Contrary to the dissent's assertion, the State did not *guarantee* eligibility determinations or even fair hearings for all of the named plaintiffs and the 100 other class members identified. *See* R. 1 (Compl. ¶¶ 151–63) (Page ID #35–37). For the named plaintiffs who are not infants, the State agreed only to "review [their] files and *attempt* to resolve any discrepancies" that might be the cause of the delay on their applications. R. 53 (Hagan Decl. ¶ 12) (Page ID #672) (emphasis added). The Joint Motion therefore does not reveal a meeting of the minds to resolve the case.

We recognize that the Joint Motion did eventually *result* in the State providing the requested relief, and the Plaintiffs' individual claims became moot. Thus, Plaintiffs' involvement was not entirely involuntary: Plaintiffs knew that by giving the State more time to file its briefing, and by agreeing to the special review process, they might receive their requested relief. However, even if we were to find that Plaintiffs voluntarily settled their claims, which we explicitly do not, it would not end our analysis as two separate exceptions to mootness apply here.[2]

**B. Two Exceptions to Mootness Apply.**

Although Plaintiffs did not voluntarily relinquish their claims, they did receive relief before certification, and the action would, under the ordinary rule, become moot absent an exception. *Brunet*, 1 F.3d at 399. We hold that the district court correctly concluded that the

---

[2]The Supreme Court has never addressed whether a named plaintiff who voluntarily settles her claim can continue to represent a class. And we do not read the Court's cases that have considered the effect of a potentially moot individual claim on a nascent class action as implying that a voluntary settlement would render a case moot. *Deposit Guaranty National Bank v. Roper*, 445 U.S. 326 (1980), and *Geraghty*, 445 U.S. at 388, both involved unilateral action. In *Roper* it was objected-to settlement offers from the defendant, 445 U.S. at 329; in *Geraghty* it was the named plaintiff's mandatory release from prison, 445 U.S. at 394. Both cases held that the named plaintiffs retained a personal stake in the litigation sufficient to appeal a denial of class certification, and neither decision turned on the fact that the action at issue was unilateral. *Roper*, 445 U.S. at 340; *Geraghty*, 445 U.S. at 404. And although our circuit confronted a similar set of facts in an earlier case, we expressly declined to determine whether the difference between voluntary and involuntary settlements is relevant when the plaintiff retains a personal stake in the litigation. *See Pettrey*, 584 F.3d at 702–03, 706 n.3. We see no need to determine it now. This is an area of considerable complexity that has divided our sister circuits. *Compare Ruppert v. Principal Life Ins. Co.*, 705 F.3d 839, 844 (8th Cir. 2013), *and Rhodes v. E.I. Du Pont De Nemours & Co.*, 636 F.3d 88, 100 (4th Cir. 2011), *with Espenscheid v. DirectSat USA, LLC*, 688 F.3d 872, 874–76 (7th Cir. 2012); *Narouz v. Charter Commc'ns, LLC*, 591 F.3d 1261, 1264–65 (9th Cir. 2010); *Pastor v. State Farm Mut. Auto. Ins. Co.*, 487 F.3d 1042, 1043–44 (7th Cir. 2007); *Richards*, 453 F.3d at 528–29; *and Love v. Turlington*, 733 F.2d 1562, 1565 (11th Cir. 1984).

"inherently transitory" exception and the "picking off" exception apply. However, the district court erred in holding that the "capable of repetition yet evading review" exception applies.

### 1. "Inherently transitory" exception

In *Sosna*, the Supreme Court first hinted at what would become the "inherently transitory" exception to normal mootness rules when the named plaintiff's claims become moot prior to class certification:

> There may be cases in which the controversy involving the named plaintiffs is such that it becomes moot as to them before the district court can reasonably be expected to rule on a certification motion. In such instances, whether the certification can be said to 'relate back' to the filing of the complaint may depend upon the circumstances of the particular case and especially the reality of the claim that otherwise the issue would evade review.

419 U.S. at 402 n.11; *see also Geraghty*, 445 U.S. at 399 (describing this as the "inherently transitory" exception).

The Supreme Court applied this exception in *Gerstein v. Pugh*, 420 U.S. 103 (1975). The named plaintiffs in that case filed a class action composed of pretrial detainees alleging that Florida violated their constitutional rights by not providing a prompt judicial hearing on probable cause. *Id.* at 105–07. "[T]he record d[id] not indicate whether any of [the named plaintiffs] were still in custody awaiting trial when the District Court certified the class." *Id.* at 111 n.11. The Supreme Court nevertheless held that the case was not moot. *Id.* The Court explained that "[t]he length of pretrial custody cannot be ascertained at the outset, and it may be ended at any time by release on recognizance, dismissal of the charges, or a guilty plea, as well as by acquittal or conviction after trial." *Id.* Thus, the Court continued, "[i]t is by no means certain that any given individual, named as plaintiff, would be in pretrial custody long enough for a district judge to certify the class." *Id.* Unlike the "capable of repetition but evading review" exception, the Court did not require that the named plaintiffs show that they personally will be subject to the same practice again. *Geraghty*, 445 U.S. at 399 ("There was no indication that the particular named plaintiffs [in *Gerstein*] might again be subject to pretrial detention."). Rather, the Court required only that other class members would suffer the same injury: "in this case the constant existence of a class of persons suffering the deprivation is certain." *Gerstein*, 420 U.S. at 111 n.11. The

Supreme Court has applied the "inherently transitory" exception in several other cases. *See, e.g.*, *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 51–52 (1991); *Swisher v. Brady*, 438 U.S. 204, 213 n.11 (1978).

Courts have distilled from *Gerstein* two requirements for the "inherently transitory" exception to apply: (1) that the injury be so transitory that it would likely evade review by becoming moot before the district court can rule on class certification, and (2) that it is certain other class members are suffering the injury. *See, e.g.*, *Olson v. Brown*, 594 F.3d 577, 582 (7th Cir. 2010). The State does not dispute that the second requirement is met.

The key point of disagreement between the parties is the meaning of "transitory." The State argues that Plaintiffs' claims are not "inherently transitory" because this exception is limited to cases in which the nature of the plaintiff's claims is so fleeting that "'*no plaintiff* possesse[s] a personal stake in the suit long enough for litigation to run its course,' and the challenged conduct would therefore be 'effectively unreviewable' if former class members were not allowed to proceed." Appellant Br. at 29 (quoting *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1531 (2013)). Essentially, the State argues that the claim must naturally expire in a short amount of time. Here, however, the State emphasizes that Plaintiffs have experienced delays in receiving hearings that are measured in months, not days, and thus in theory there could be individuals whose claims remain live long enough for a court to rule on a class certification motion. *Id.* at 30–31. Plaintiffs respond that claims can also be "inherently transitory" when it is uncertain how long the claim will remain live after litigation commences, not only whether the claim lasts days as opposed to months. Appellee Br. at 52. Here, the State can quickly process a delayed application soon after litigation begins, and thus the duration of any plaintiff's claim is uncertain. *Id.* at 53.

We think Plaintiffs have the better argument that the uncertainty about how long an injury caused by ongoing conduct will persist can also render a claim inherently transitory. To be sure, in some of the Supreme Court cases applying this exception, the duration of the challenged conduct was quite short. *McLaughlin*, 500 U.S. at 47–48 (pretrial detention of only days); *Swisher*, 438 U.S. at 213 n.11 (noting "the rapidity of judicial review of exceptions to masters' proposals" in juvenile cases, the practice the class sought to challenge). However, there

is also support for Plaintiffs' argument. *Gerstein* focused on the fact that "[t]he length of pretrial custody cannot be ascertained at the outset." 420 U.S. at 111 n.11. The Supreme Court did not point to the fact that class members were in pretrial custody only for a certain, short length of time; in fact, nowhere in the opinion does the Court discuss how long on average class members were in pretrial detention without a probable cause determination. *Id.* at 106 (noting only that "a person charged by information could be detained for a substantial period solely on the decision of a prosecutor").

The sole case in our circuit to address this issue has taken Plaintiffs' approach. In *Gawry v. Countrywide Home Loans, Inc.*, we explained that "the crux of the 'inherently transitory' exception is the uncertainty about the length of time a claim will remain alive." 395 F. App'x 152, 158–59 (6th Cir. 2010) (quoting *Olson*, 594 F.3d at 582). We then concluded that the exception did not apply in that case because the named plaintiff "knew (or should have known) that her claim would become moot when her prepayment rider expired after three years. And yet, plaintiffs did not move for class certification until nearly five years after Carr executed the allegedly illegal note." *Id.* at 159 (internal citation omitted).

In *Olson*, the Seventh Circuit case we relied upon in *Gawry*, the court held that a class action brought by inmates alleging constitutional violations at a county jail was not moot even though the named plaintiffs were transferred out of the jail before the class was certified. 594 F.3d at 582. The court explained that "[w]hile the ultimate length of confinement does affect the applicability of the 'inherently transitory' exception, *the essence of the exception is uncertainty about whether a claim will remain alive for any given plaintiff long enough for a district court to certify the class.*" *Id.* (emphasis added). The Seventh Circuit then emphasized that the named plaintiff "did not know when his claim would become moot" because "[t]he duration of his claim was at the discretion of the Indiana Department of Correction. An individual incarcerated in a county jail may be released for a number of reasons that he cannot anticipate." *Id.* at 583.

Other courts have also focused on uncertainty about how long a claim will remain live, and the defendant's ability to quickly render a claim moot, in holding that this exception applies. In *Robidoux v. Celani*, for example, the Second Circuit held that a class action challenging

delays in processing various public assistance applications was not moot even though the named plaintiffs received their benefits before the class could be certified on remand. 987 F.2d 931, 939 (2d Cir. 1993). The court explained that "[a]ppellants' claims are inherently transitory since the Department will almost always be able to process a delayed application before a plaintiff can obtain relief through litigation." *Id.* The court did not consider average delays in processing those applications. *Id. See also Thorpe v. District of Columbia*, 916 F. Supp. 2d 65, 67 (D.D.C. 2013) (holding that the "inherently transitory" exception applied to claims of nursing home inhabitants as "[t]he length of any individual's stay in a nursing facility is impossible to predict, so even though there are certainly individuals whose claims will not expire within the time it would take to litigate their claims, there is no way for plaintiffs to ensure that the Named Plaintiffs will be those individuals").

It is true, as the State argues, that the Supreme Court's recent decision in *Genesis Healthcare* described this doctrine as "focused on the fleeting nature of the challenged conduct giving rise to the claim, not on the defendant's litigation strategy" and emphasized that it has been applied when "no plaintiff possessed a personal stake in the suit long enough for litigation to run its course." 133 S. Ct. at 1531. However, this discussion does not foreclose application of the inherently transitory exception to claims for injunctive relief from ongoing conduct of inherently uncertain duration. The Court concluded that the inherently transitory line of cases did not apply in *Genesis Healthcare* mainly because the suit sought damages rather than injunctive relief; the Court did not rest its conclusion on the distinction between claims of inherently uncertain duration and claims of inherently limited duration. *Id.* In any event, as *Genesis Healthcare* is a FLSA case, and, as discussed more fully below, the Court distinguished the law applicable to FLSA collective actions from Rule 23 classes, *Genesis Healthcare* does not control this case.

Moreover, the Court's reference to "litigation strategy" must be understood in the particular factual context of *Genesis Healthcare*, specifically that the plaintiffs argued that their claims were inherently transitory because at any point the defendant could moot them by making a Rule 68 offer of judgment that fully satisfied the named plaintiffs' claims (a similar argument to that in the "picking off" cases from other circuits discussed below). *Id.* This is a much more

expansive argument than that in the present case because the uncertainty of the injury here is tied to the type of claim—a failure to provide timely hearings, which could be remedied quite quickly—as opposed to *any* type of damages claim that could be mooted by a Rule 68 offer of judgment. The fact that the statute sets relatively short time periods within which applications must be resolved—45 days and 90 days—reinforces that claims of delay or the failure to provide hearings can be resolved quickly. Moreover, other types of claims for injunctive relief are not necessarily quite as easily resolved so speedily.

In sum, the "inherently transitory" exception to mootness applies to this case. Plaintiffs did not know how long their claims for injunctive relief from delay would remain live. The duration of Plaintiffs' claims was tenuous. The State could quickly either hold a hearing on their delayed applications for Medicaid or enroll them in TennCare at any point after the 45- or 90-day deadline expired, as actually occurred in this case, before the district court could reasonably be expected to rule on the class certification motion.

## 2. "Picking off" exception

The potential exception to mootness where a defendant picks off named plaintiffs in a class action before the class is certified originates from the Supreme Court's decision in *Deposit Guaranty National Bank v. Roper*. The Court explained that:

> To deny the right to appeal simply because the defendant has sought to "buy off" the individual private claims of the named plaintiffs would be contrary to sound judicial administration. Requiring multiple plaintiffs to bring separate actions, which effectively could be "picked off" by a defendant's tender of judgment before an affirmative ruling on class certification could be obtained, obviously would frustrate the objectives of class actions; moreover it would invite waste of judicial resources by stimulating successive suits brought by others claiming aggrievement.

445 U.S. 326, 339 (1980). Although it is true that the district court in *Roper* already had denied the motion for class certification when the defendant sought to pick off the named plaintiff, we see no distinction between picking off a named plaintiff when a motion for class certification has been filed and is then pending and picking off a named plaintiff after the motion for class certification has been denied. In both scenarios, the defendant is on notice that the named

plaintiff wishes to proceed as a class, and the concern that the defendant therefore might strategically seek to avoid that possibility exists.

Even before *Roper*, we recognized an exception to mootness to address a similar concern of defendants strategically mooting named plaintiffs' claims in an attempt to avoid a class action. In *Blankenship v. Secretary of HEW*, we held that a class action to challenge delays by the Social Security Administration in scheduling administrative hearings was not moot even though "[a]ll of the named plaintiffs received disability hearings before the District Court granted class certification." 587 F.2d 329, 331–33 (6th Cir. 1978). We explained that:

> [t]he claims of delay which the plaintiffs advance, however, epitomize the type of claim which continually evades review if it is declared moot merely because the defendants have voluntarily ceased the illegal practice complained of in the particular instance. Thus, the defendants may expedite processing for any plaintiffs named in a suit while continuing to allow long delays with respect to all other applicants. . . . [R]efusal to consider a class-wide remedy merely because individual class members no longer need relief would mean that no remedy could ever be provided for continuing abuses.

*Id.* at 333. Thus, we concluded that "the class members retain a live interest in this case" and that "the class certification should 'relate back' to the date of the filing of the complaint." *Id.*

Since *Roper*, we have recognized this line of reasoning under analogous circumstances. In *Carroll v. United Compucred Collections, Inc.*, we held that a class action was not moot even though the named plaintiffs had been tendered a Rule 68 offer of judgment because a motion for class certification was then pending.[3] 399 F.3d 620, 625 (6th Cir. 2005). The *Carroll* court cited our decision in *Brunet* as support, and articulated a concern about defendants strategically picking off named plaintiffs to avoid class actions. *Carroll*, 399 F.3d at 625 ("'If a tender made to the individual plaintiff while the motion for certification is pending could prevent the courts from ever reaching the class action issues, that opportunity is at the mercy of a defendant, even in cases where a class action would be most clearly appropriate.'" (quoting *Brunet*, 1 F.3d at

---

[3]Although the magistrate judge had issued a Report and Recommendation recommending that a class be certified when the defendant had made the Rule 68 offer, we did not limit our holding to that factual scenario. *Carroll*, 399 F.3d at 625. We in fact stated the rule more broadly, explaining that we read *Brunet* as suggesting that "it would be inappropriate to hold that a case was mooted by a settlement offer made to a named plaintiff when a motion for class certification was pending," full-stop. *Id.*

400)).  In *Brunet*, we recognized that some courts had applied a "picking off" exception.  *Brunet*, 1 F.3d at 400 ("Some courts have held that a case does not become moot where a defendant 'picks off' the claims of named plaintiffs with settlement offers in an attempt to avoid a class action . . . where 'a motion for class certification has been pursued with reasonable diligence and is then pending before the district court.'" (quoting *Susman v. Lincoln Am. Corp.*, 587 F.2d 866, 870 (7th Cir. 1978))).

Other circuits have applied or recognized the "picking off" exception along the lines articulated in *Roper*.  *See, e.g.*, *Lucero v. Bureau of Collection Recovery, Inc.*, 639 F.3d 1239, 1250 (10th Cir. 2011) ("[W]e hold that a named plaintiff in a proposed class action for monetary relief may proceed to seek timely class certification where an unaccepted offer of judgment is tendered in satisfaction of the plaintiff's individual claim before the court can reasonably be expected to rule on the class certification motion.").  Some of these decisions blend the "picking off" exception with the "inherently transitory" exception, calling the claims transitory by virtue of the fact that the defendant could pick off the named plaintiffs with Rule 68 offers of judgment before a motion for class certification could be ruled on.  *See, e.g.*, *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1091 (9th Cir. 2011) ("[W]e see no reason to restrict application of the relation-back doctrine only to cases involving *inherently* transitory claims.  Where, as here, a defendant seeks to 'buy off' the small individual claims of the named plaintiffs, the analogous claims of the class—though not *inherently* transitory—become no less transitory than inherently transitory claims."); *Weiss v. Regal Collections*, 385 F.3d 337, 347 (3d Cir. 2004) ("Although Weiss's claims here are not 'inherently transitory' as a result of being time sensitive, they are acutely susceptible to mootness, in light of defendants' tactic of 'picking off' lead plaintiffs with a Rule 68 offer to avoid a class action." (internal quotation marks and citation omitted)), *abrogated by Campbell-Ewald*, 136 S. Ct. at 669, 672; *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1050 (5th Cir. Unit A 1981) ("[W]hile we recognize that the named plaintiffs in this case have not presented claims which by their nature are so transitory that no single named plaintiff with such a claim could maintain a justiciable case long enough to procure a decision on class certification, we believe that the result should be no different when the defendants have the ability by tender to each named plaintiff effectively to prevent any plaintiff in the class from procuring a decision on class certification.  By tendering to the named plaintiffs the full amount

of their personal claims each time suit is brought as a class action, the defendants can in each successive case moot the named plaintiffs' claims before a decision on certification is reached. A series of individual suits, each brought by a new named plaintiff, could individually be 'picked off' before class certification."); *see also Stein v. Buccaneers Ltd. P'ship*, 772 F.3d 698, 704–05 (11th Cir. 2014) (affirming that *Zeidman*, "a Fifth Circuit decision issued before October 1, 1981," is also binding law in the Eleventh Circuit).

Although the Supreme Court's decision in *Genesis Healthcare* may be read as casting doubt on the continued vitality of this exception, it does not overrule this part of *Roper*, as the State claims, or the circuit cases applying this reasoning. The Court in *Genesis Healthcare* characterized *Roper*'s discussion of "picking off" named plaintiffs as "dicta," and emphasized that "*Roper*'s holding turned on a specific factual finding that the plaintiffs' possessed a continuing personal economic stake in the litigation, even after the defendants' offer of judgment." 133 S. Ct. at 1532. However, *Genesis Healthcare* involved FLSA collective actions, not Rule 23 class actions. The Supreme Court took pains to emphasize that Rule 23 actions are "fundamentally different from collective actions under the FLSA." *Id.* at 1529. The Court explained that, unlike FLSA collective actions, "a putative class acquires an independent legal status once it is certified under Rule 23," whereas "[u]nder the FLSA, by contrast, 'conditional certification' does not produce a class with an independent legal status, or join additional parties to the action." *Id.* at 1530. Even if *Genesis Healthcare* were to apply to Rule 23 class actions, it is factually distinguishable because the class representative "had not yet moved for 'conditional certification' when her claim became moot." *Id.*

The Supreme Court recently had the opportunity to address the "picking off" exception in *Campbell-Ewald v. Gomez,* which considered whether an unaccepted offer to satisfy a named plaintiff's individual claim mooted the case. 136 S. Ct. at 666. The named plaintiff argued that "*Roper*'s specific disapproval of . . . efforts to evade class certification by offering 'complete relief' to the representative plaintiff" foreclosed a finding of mootness. Brief for Respondent at 38, *Campbell-Ewald Co. v. Gomez,* 136 S. Ct. 663 (2016) (No. 14-857). The Supreme Court agreed that the case was not moot, but grounded its holding in "basic principles of contract law" instead. 136 S. Ct. at 670. Though *Campbell-Ewald* sheds little light on the "picking off"

exception, the Court did observe that allowing an unaccepted offer to moot a case would place defendants like Campbell-Ewald "in the driver's seat," enabling them to avoid significant class-based liability. *Id.* at 672. As the Court explained, "Campbell sought to avoid a potential adverse decision, one that could expose it to damages a thousand-fold larger than the bid Gomez declined to accept." *Id.*

The State next argues that there is insufficient evidence that it was actually attempting strategically to moot Plaintiffs' claims, and it cites three out-of-circuit cases declining to find that the "picking off" exception applies without evidence of such a motive. Appellant Br. at 26–28; *Cruz v. Farquharson*, 252 F.3d 530, 535 (1st Cir. 2001) (declining to apply this exception where the INS ruled on delayed petitions for visas and permanent residence, thus mooting the plaintiffs' claims related to that delay, because "[o]ne swallow does not a summer make, and we have no acceptable basis to conclude, without a more substantial factual predicate, that the INS has devised a scurrilous pattern and practice of thwarting judicial review"); *Sze v. I.N.S.*, 153 F.3d 1005, 1008 (9th Cir. 1998) (declining to apply the exception where the INS ruled on the plaintiffs' applications for naturalization that the plaintiffs argued were illegally delayed because "[p]laintiffs have demonstrated no more than correlation; they have not shown causation"); *Rocky v. King*, 900 F.2d 864, 870–71 (5th Cir. 1990) ("There is no indication that Angola officials will remove . . . inmates from field work before a district court rules on class certification in order to render [a] claim [relating to conditions for field workers] moot.").

To the extent that evidence of a defendant's actual motive to avoid a class action is necessary,[4] the evidence could support such a finding in this case. Here, the State did not address the delays relating to Plaintiffs' applications until after the lawsuit and contemporaneous motion for class certification were filed, despite the fact that Plaintiffs had brought four of these cases to the State's attention before the lawsuit was filed. R. 53 (Hagan Decl. ¶ 11) (Page ID #671); *see also Pettrey*, 584 F.3d at 707 (stating that the concern related to "picking off named plaintiffs . . . arises[s] when a defendant attempts to eliminate the named plaintiffs at the outset

---

[4]In *Blankenship*, we did not point to evidence of such an improper motive by the defendants, and instead "focused on the *ability* and *action*" of the defendant in mooting named plaintiffs' claims, whatever the reason. Appellee Br. at 50–51; *Blankenship*, 587 F.2d at 333. The cases from other circuits discussed above also did not point to evidence of such a motive, although all of those cases involved Rule 68 offers of judgment, which are intended to end litigation.

of the class action by convening an offer of judgment or settlement with the named plaintiffs *before or immediately after a class certification motion is filed*" (emphasis added)). The exact timing of when the last claim of a class member identified by Plaintiffs was mooted—on the eve of the hearing on the preliminary injunction and class certification motions—would also support a finding of motive. R. 93 (Mot. Hr'g Tr. at 80–82) (Page ID #1424–26); *see Sze*, 153 F.3d at 1008 (finding no evidence that the defendants intended to avoid a class action where the last named plaintiff's claim was not mooted until an appeal of summary judgment was pending before the Ninth Circuit). Moreover, unlike in *Cruz, Sze*, or *Rocky*, the State in this case did not moot Plaintiffs' claims through an established, standard procedure such that it might more clearly be characterized as "incidental" or "a matter of standard operating procedure." William B. Rubenstein, *Newberg on Class Actions* § 2:15 (5th ed. 2015) (noting that it is possible when named plaintiffs' claims are mooted by actions other than Rule 68 offers, "a defendant may unilaterally accord individual relief to a named plaintiff incidentally or as a matter of standard operating procedure without any specific intention of preventing judicial review of class claims"). Instead, the State created a new, ad hoc process to address Plaintiffs' claims. Even if this evidence is not sufficient to find an improper motive at this stage in the litigation, reversal on this ground would not be the answer: the district court should have the opportunity to make an evidentiary finding in the first instance.

In sum, we hold that the district court had an adequate basis on which to conclude that the "picking off" exception applies to this case. As in *Blankenship*, absent application of the exception "the defendants may expedite processing for . . . plaintiffs named in a suit while continuing to allow long delays with respect to . . . other applicants. . . . [R]efusal to consider a class-wide remedy merely because individual class members no longer need relief would mean that no remedy could ever be provided for continuing abuses."[5] 587 F.2d at 333.

---

[5]A separate issue is whether the "picking off" exception applies at all where the named plaintiffs voluntarily settle their individual claims. *Campbell-Ewald*, which concerned an *unaccepted* settlement offer, provides no guidance. *See* 136 S. Ct. at 666. As discussed previously, we do not think that the Joint Motion should be treated the same as a voluntary settlement agreement. Even if it were equivalent, however, we still believe that the "picking off" exception applies. We recognize that this places us in some tension with other circuits. *See, e.g., Thomas v. Mamaso, Inc.*, 548 F. App'x 131, 132 (5th Cir. 2013); *Potter v. Norwest Mortgage, Inc.*, 329 F.3d 608, 612–13 (8th Cir. 2003); *Toms v. Allied Bond & Collection Agency, Inc.*, 179 F.3d 103, 106–07 (4th Cir. 1999). However, we think that the proper focus of this exception is on *the defendant's* behavior to avoid a class action.

### 3. "Capable of repetition yet evading review" exception

Finally, the district court erred in holding that the "capable of repetition yet evading review" exception to mootness applies to this case. For this exception to apply, "a challenged action must satisfy two requirements. First, it must be too short in duration to be fully litigated before it ceases. Second, there must be a *reasonable* expectation that the *same parties* will be subjected to the same action again." *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 430 (6th Cir. 2013) (citation omitted) (emphases added). Plaintiffs cannot meet the second requirement. Medicaid recipients' eligibility must be reassessed every twelve months. 42 C.F.R. § 435.916(a)(1). However, federal regulations implementing Medicaid require that states continue to provide Medicaid to applicants while their applications for renewal are considered. *Id.* § 435.930(b) ("The agency must . . . [c]ontinue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible"). The State has not yet created a post-ACA redetermination process. Appellant Br. at 33. Plaintiffs have not presented any evidence that the State will not comply with this federal requirement. Speculation based only on problems with initial enrollment in Medicaid does not give Plaintiffs a *reasonable* expectation that they will be subject to delays that will result in the loss of Medicaid coverage while the redetermination process is ongoing. *Cf. Dean v. Austin*, 602 F.2d 121, 124 (6th Cir. 1979) ("Similarly we do not believe that here plaintiffs have offered any evidence which would create a reasonable expectation that the U.S. Labor Party will be subjected to the same actions again."); *see also Gawry*, 395 F. App'x at 158 ("Carr has failed to present evidence showing a 'reasonable expectation' or a 'demonstrated probability' that she will be subject to the type of Countrywide loan at issue in the future.").

---

How the defendant is actually successful—whether through unilateral action or settlement with the named plaintiffs—does not affect the policy rationales underlying this exception, such as thwarting defendants' efforts to "frustrate the objectives of class actions" or preventing "waste of judicial resources by stimulating successive suits brought by others claiming aggrievement." *Roper*, 445 U.S. at 339. We also note that here, the importance of the voluntary–involuntary distinction is certainly less than it is in cases where plaintiffs have a meaningful choice to accept or reject an offer. Plaintiffs are low-income individuals who alleged that the State denied them access to essential medical services. When the State finally agreed to evaluate their applications, could Plaintiffs really have rejected that offer in the hope that the district court would grant certification and eventually order relief?

**III.  ANALYSIS:  The District Court Properly Issued a Preliminary Injunction.**

**A.  Standard of Review**

We must balance four factors in deciding whether to issue a preliminary injunction: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (internal quotation marks omitted).  "Whether the movant is likely to succeed on the merits is a question of law we review de novo."  *Id.*  We review the overall determination of whether a preliminary injunction is warranted, however, for an abuse of discretion.  *Id.*  "This standard is deferential, but [we] may reverse the district court if it improperly applied the governing law, used an erroneous legal standard, or relied upon clearly erroneous findings of fact."  *Id.*

**B.  The District Court Did Not Abuse its Discretion in Granting the Preliminary Injunction.**

> **1.  Plaintiffs are likely to succeed on the merits because Tennessee retains ultimate responsibility for administering Medicaid despite the passage of the ACA.**

The district court held that Plaintiffs are likely to succeed on the merits because "the State can[not] delegate its responsibilities under the Medicaid program to some other entity— whether that entity is a private party or the Federal Government."  R. 91 (Order re: Prelim. Inj. at 5) (Page ID #1284).  The district court found that "this principle is longstanding and was not altered by the [ACA]."  *Id.*  The district court also gave weight to the United States' amicus curiae brief setting forth the same position.  *Id.*

The crux of the State's argument is that, by authorizing federal Exchanges in the states, the ACA altered the prior rule that the state Medicaid agency is ultimately responsible for administering Medicaid and ensuring it complies with federal law.  Appellant Br. at 34–35.  The State claims that CMS is solely responsible for the delays in making benefits-eligibility determinations.  *Id.* at 8.  Those delays, the State argues, arise because CMS "has not developed

a process for reviewing the supplemental verification documentation submitted by applicants" when there are data inconsistencies between information on the applicant's Medicaid application and information in the Federal Data Services Hub. *Id.* at 9–10; United States Amicus Br. at 7. Additionally, the State argues that "the Federal Exchange has not provided the State with the basic information it needs to process . . . [delayed] applications itself."[6] Appellant Br. at 10. Holding Tennessee responsible in this case, the State argues, would require Tennessee to supervise federal officials at CMS, violating long-standing federalism principles, and the State asserts that nothing in the ACA grants states such authority. *Id.* at 35–36. Rather, the State argues that the "only remedy for delays at the hands of the Federal Exchange is against the federal officials who oversee it." *Id.* at 36.

### a. Despite the passage of the ACA, states remain ultimately responsible for ensuring their Medicaid programs comply with federal law.

We hold that the plain text of the Medicaid statute and its implementing regulations indicate that the district court did not err in holding that Plaintiffs are likely to succeed on the merits. Again, the Medicaid statute requires that the state designate "a single State agency to administer or to supervise the administration of the plan." 42 U.S.C. § 1396a(a)(5). However, its implementing regulations provide that, although the state can delegate authority to other entities to perform certain functions, the state Medicaid agency "may not delegate, to other than its own officials, the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters." 42 C.F.R. § 431.10(c), (e). As the State acknowledges, courts have interpreted this regulation to mean that the state Medicaid agency remains "legally responsible for problems with a state's Medicaid program notwithstanding delegations of authority to other state agencies or private parties." Appellant Br. at 34; *see, e.g., Catanzano ex rel. Catanzano v. Dowling*, 60 F.3d 113, 118 (2d Cir. 1995) (affirming the district court's

---

[6]When this suit was filed, the State argues, CMS did not share any information with the State about pending TennCare applications, and now CMS only "intermittently" sends the State "'special flat files'—essentially giant Excel spreadsheets—listing the names of people whose unadjudicated applications were flagged for some type of data inconsistency." Appellant Br. at 10 (citing R. 54 (Long Decl. at 9–10) (Page ID #684–85); R. 80-3 (Long Supp. Decl. at 3, 6–7) (Page ID #1191, 1194–95)). However, the State argues that these files "do not contain reliable application dates or information from any subsequent correspondence between the applicant and the Federal Exchange." *Id.* at 10–11 (citing R. 80-3 (Long Supp. Decl. at 4) (Page ID #1192)).

"persuasive reasoning" that "it is patently unreasonable to presume that Congress would permit a state to disclaim federal responsibilities by contracting away its obligations to a private entity" (internal quotation marks omitted)); *McCartney ex rel. McCartney v. Cansler*, 608 F. Supp. 2d 694, 701 (E.D.N.C. 2009) (holding that the state Medicaid agency "may not disclaim its responsibilities under federal law by simply contracting away its duties"), *aff'd sub nom. D.T.M. ex rel. McCartney v. Cansler*, 382 F. App'x 334 (4th Cir. 2010); *Carr v. Wilson-Coker*, 203 F.R.D. 66, 75 (D. Conn. 2001) (holding that the state Medicaid agency's "duties relative to ensuring that the plaintiffs receive medical services with reasonable promptness are non-delegable"); *J.K. ex rel. R.K. v. Dillenberg*, 836 F. Supp. 694, 699 (D. Ariz. 1993) ("The law demands that the designated single state Medicaid agency must oversee and remain accountable for uniform statewide utilization review procedures conforming to bona fide standards of medical necessity."); *see also Tenn. Ass'n of Health Maint. Orgs., Inc. v. Grier*, 262 F.3d 559, 565 (6th Cir. 2001) (holding that private entities that had contracted with TennCare are bound by a consent decree to which TennCare is a party because they "are acting on behalf of the State, since the State, by statute, is the 'single State agency' responsible for administration of the TennCare program" and citing 42 U.S.C. § 1396a(a)(5)).

Nothing in the ACA modifies this long-standing principle. In fact, 42 U.S.C. § 18118(d) provides that "[n]othing in this title (or an amendment made by this title, *unless specified by direct statutory reference*) shall be construed to modify any existing Federal requirement concerning the State agency responsible for determining eligibility for programs identified in section 18083 of this title," which includes Medicaid. 42 U.S.C. § 18118(d) (emphasis added). Tennessee cannot point to any direct statutory reference relieving states from their general obligation to ensure their Medicaid programs comply with federal law or relieving states from their obligation to provide "a fair hearing *before the State agency*" on delayed applications, *see* 42 U.S.C. § 1396a(a)(3) (emphasis added)—the limited command of the preliminary injunction. Instead, the State points to 42 U.S.C. § 18041(c)(1), which directs "the Secretary [to] . . . establish and operate such Exchange[s] within the State" and to "take such actions as are necessary to implement such other requirements" that apply to state Exchanges, *see* 42 U.S.C. § 18041(c)(1), which the State argues includes promptly adjudicating claims and providing fair hearings, Reply Br. at 17.

The ACA does require the federal government to provide fair hearings on eligibility determinations made by the Exchange. 42 U.S.C. § 18081(f)(1). However, the better reading of the ACA is that it imposes a *parallel* obligation on the federal government to provide fair hearings on eligibility determinations made by the Exchange, which does not displace the state Medicaid agency's general obligation to ensure fair hearings on all Medicaid eligibility determinations. *Exchanges: Eligibility and Enrollment*, 78 Fed. Reg. 42160-01, 42164 (July 15, 2013) (explaining that "section 1902(a)(3) of the Act . . . requires" that individuals have "an opportunity for a fair hearing before the Medicaid agency" even if the state elects to have the federal government operate its Exchange); *id.* at 42165 ("[B]oth state Medicaid agencies and the Exchange have distinct responsibilities to provide for such hearings, and we do not have authority to eliminate individuals' statutory rights, or a Medicaid agency's or Exchange's statutory responsibility.").

Nor does the creation of the "determination" option for federal Exchange states provide the "direct statutory reference" for the State's argument. The regulation allowing states to elect to be a determination state also requires that the state Medicaid agency "ensure" that "all relevant Federal and State law, regulations[,] and policies" are followed and to "institute corrective action as needed." 42 C.F.R. § 431.10(c)(3). The regulation also specifies that a state can only "[d]elegate authority to conduct fair hearings" for MAGI-based categories to an Exchange—a delegation that requires a written agreement—"provided that individuals who have requested a fair hearing of such a denial are given a choice to have their fair hearing instead conducted by the Medicaid agency." *Id.* §§ 431.10(c)(1)(ii), (d). Although it is not clear whether states can also delegate authority to conduct fair hearings on delayed applications—the sole focus of the preliminary injunction—this further illustrates that the ACA creates parallel federal and state processes for aggrieved individuals.

### b. The preliminary injunction does not require the State to supervise CMS.

The State's argument that the preliminary injunction would require it to supervise federal officials at CMS overstates the scope of the preliminary injunction and is not grounded in the facts of this case. The State's sole support for this argument is that, because the text of 42 U.S.C.

§ 1396a(a)(5) requires states to designate a single state agency "to administer or *to supervise*" its Medicaid plan, it necessarily follows that the state Medicaid agency must always directly supervise any agency—be it another state agency, private entity, or the federal government—to ensure that its program is complying with federal law. Reply Br. at 15–17. However, direct supervision is not the only way a state can ensure compliance with federal law, as the preliminary injunction here illustrates. The preliminary injunction merely requires the State to provide its *own* hearing on delayed applications; it does not require the State to commandeer or directly supervise CMS. As discussed in the next subsection on whether the federal government is a required party, the State can obtain the necessary information from CMS to provide such hearings and even to make a final determination of an applicant's eligibility for Medicaid—even though the preliminary injunction does not require it to do so—without impermissibly "supervising" CMS.

One final point is that the certified class includes individuals who have applied for non-MAGI categories of Medicaid, and the State remains *solely* responsible for receiving applications and determining eligibility for these categories. Thus, there is no possibility that the State would have to supervise CMS to provide fair hearings for these class members. The State argues that the class does not include these individuals because the declarations of individuals who applied for these categories of Medicaid did not state that they requested a hearing and were denied one, as the declarations of the named plaintiffs do. Reply Br. at 23. However, the class certified by the district court does not specify that only those who apply for MAGI categories of Medicaid are included; the class includes anyone who has applied for Medicaid and has not received a fair hearing on their delayed applications. R. 90 (Order re: Class Cert. at 8) (Page ID #1278). The State's argument might be relevant if it had appealed the class certification order, for example on the issues of commonality or typicality. But the State did not appeal the class certification order.

### c. The United States' position supporting Plaintiffs' argument is entitled to deference.

Further support for Plaintiffs' position can be found in the amicus curiae brief filed by the United States, which reiterates Plaintiffs' arguments. United States Amicus Br. at 12

("[Appellants'] argument misses the point, which is not that the State should supervise a federal agency directly, but that the State Medicaid agency retains ultimate responsibility to ensure that the State Medicaid program is administered in accordance with the requirements of the Medicaid statute."). The State argues that the United States' position should not be given deference because it is "wholly unsupported by regulations, rulings, or administrative practices," and is "nothing more than [the] agency's convenient litigating position." Appellant Br. at 38 (quoting *Smiley v. Citibank (South Dakota), NA*, 517 U.S. 735, 741 (1996), and *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988)).

The United States' position should be given deference. As the above discussion demonstrates, the United States' position is not "wholly unsupported." Two additional factors present or cited in *Bowen*—that the agency was itself a party and that the agency's position espoused in litigation contradicted prior interpretations of a statute, 488 U.S. at 212–13—are not present here. *See, e.g.*, *Eligibility Changes Under the Affordable Care Act of 2010*, 77 Fed. Reg. 17144-01, 17188 (Mar. 23, 2012) (stating that "[a]s is true whenever a single State agency delegates authority to another entity to make eligibility determinations, we continue to require that the single State agency must supervise the administration of the plan, is responsible for making the rules and regulations for administering the plan, and is accountable for the proper administration of the program," while acknowledging in the same paragraph that "delegation authority also applies to any Exchange operated by the Federal government"). Moreover, "[u]nder *Auer v. Robbins,* 519 U.S. 452 (1997), [a court must] defer to an agency's interpretation of its own regulation, advanced in a legal brief, unless that interpretation is 'plainly erroneous or inconsistent with the regulation.'" *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 208 (2011) (quoting *Auer*, 519 U.S. at 461). Nor is the United States' position a "'*post hoc* rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack." *Id.* at 209 (quoting *Auer*, 519 U.S. at 462) (alteration in original); *see also N. Fork Coal Corp. v. Fed. Mine Safety & Health Review Comm'n*, 691 F.3d 735, 742 (6th Cir. 2012) ("[L]itigating positions [of federal agencies] are entitled to deference when they are not '*post hoc* rationalization[s]' of previous agency actions." (internal quotation marks omitted) (alteration in original)).

**2. The federal government is not a required party.**

The State also argues that the federal government is a required party in this case. Appellant Br. at 42. Federal Rule of Civil Procedure 19(a)(1) states that a party "must be joined" if "in that person's absence, the court cannot accord complete relief among existing parties" or "that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19(a)(1). We review a district court's decision whether a party must be joined under Rule 19(a)(1) for an abuse of discretion. *PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 200 (6th Cir. 2001). The district court did not abuse its discretion in determining CMS is not a party that must be joined.

The State first argues that the court cannot accord complete relief without CMS because "CMS at a minimum bears more responsibility than the State for the delays Plaintiffs experienced" and no regulation compels CMS to provide information to states on pending applications. Appellant Br. at 42–43. However, as Plaintiffs argue, the fact that there is no mechanism compelling CMS to transfer information to states on pending applications does not mean that there is no way for the State to obtain the information necessary to hold a hearing on delayed applications. Appellee Br. at 38. As the district court held, "there is no legal or factual barrier preventing the State from obtaining information about particular individuals from the Federal Exchange." R. 91 (Order re: Prelim. Inj. at 7) (Page ID #1286). Moreover, the district court's factual determination that the State has proven it can do this—as demonstrated by "Ms. Hagan's description of how the State was able to act on the applications of several of the Plaintiffs and other individuals whose names were brought to the attention of the State"—is not clearly erroneous. *Id.* (citing R. 53 (Hagan Decl.) (Page ID #667–75)). Plaintiffs are also correct that, to the extent that CMS bears joint responsibility for delays in providing eligibility

determinations, the Supreme Court has held that joint tortfeasors are not required parties under Rule 19(a). *Temple v. Synthes Corp.*, 498 U.S. 5, 7 (1990).[7]

Nor does the district court's failure to join CMS subject the State to inconsistent legal obligations. Specifically, the State argues that it cannot comply with the preliminary injunction without violating 42 C.F.R. § 431.242 and 42 U.S.C. § 18083(b)(2). Appellant Br. at 44–47; Reply Br. at 27–30.

Section 431.242 requires that, "before the date of [a] hearing," an applicant "must be given an opportunity to . . . [e]xamine at a reasonable time . . . [t]he content of the applicant's . . . case file; and [a]ll documents and records to be used by the State . . . at the hearing." 42 C.F.R. § 431.242. The State argues that it cannot comply with this provision because it does not have an applicant's "complete case file." Appellant Br. at 45.

Plaintiffs and the United States have the better argument that the plain text of § 431.242 does not provide that a state can comply with its requirements *only* by providing an applicant the *complete* case file. Rather, it says only that a state must provide the applicant access to the "case file." 42 C.F.R. § 431.242(a)(1); *see also id.* § 431.958 (defining "[c]ase record" as "either a hardcopy or electronic file that contains information on a beneficiary regarding program eligibility"). A "straightforward construction" of this provision is that "the State must simply provide all the evidence related to the applicant that it possesses." Appellee Br. at 40. The United States has similarly interpreted this regulation to mean that "the agency complies with the regulation by making available the relevant information it has" because "[t]he purpose of the requirement is to ensure that an applicant has access to the material the State Medicaid agency will consider in conducting a hearing." United States Amicus Br. at 14. This interpretation— which does not contradict the unambiguous text of the regulation as the State argues, Reply Br. at 28—is similarly entitled to *Auer* deference, for the reasons discussed above in Section V.B.1. Nor do the regulations require that a hearing officer have access to a complete case file to determine the reason for the delay, as the State suggests. Appellant Br. at 45. Rather, the

---

[7]Although the State is correct that the district court in *Temple* labeled the "joint tortfeasors as indispensable parties under Rule 19(b)," Reply Br. at 27, the Supreme Court held that "no inquiry under Rule 19(b) is necessary[] because the threshold requirements of Rule 19(a) have not been satisfied." 498 U.S. at 8.

regulations require that "[h]earing recommendations or decisions must be based exclusively on evidence introduced at the hearing." 42 C.F.R. § 431.244(a). Even if the State's interpretation of the regulation is accepted, the district court's conclusion that the State could acquire information about an applicant's complete case file is not clearly erroneous for the reasons discussed above in Section V.B.2.

42 U.S.C. § 18083(b)(2) states that "an applicant filing" the streamlined application for health coverage "shall receive notice of eligibility for an applicable State health subsidy program without any need to provide additional information or paperwork unless such information or paperwork is specifically required by law when information provided on the form is inconsistent with data used for the electronic verification . . . or is otherwise insufficient to determine eligibility." The State argues that the preliminary injunction may force them to violate this provision because "if the State wishes to actually adjudicate the Medicaid application submitted to the Federal Exchange, . . . the State has no choice but to ask applicants about their income and when they first applied to TennCare—information the Federal Exchange already has but refuses to share." Appellant Br. at 45.

There are two problems with this argument. First, the preliminary injunction does not require the State actually to adjudicate class members' benefits applications; it simply requires a fair hearing on the cause of the delay and whether that delay is reasonable. *See* R. 91 (Order re: Prelim. Inj. at 8–9) (Page ID #1287–88). Additional information an applicant might need to provide would simply be proof of the date his/her application was submitted. Second, applicants are permitted to submit voluntarily additional information at hearings. 42 C.F.R. § 431.242(b)–(e). Presumably, class members would be willing to do so in order to obtain a hearing.

### 3. The district court did not abuse its discretion in determining that overall, the preliminary injunction was warranted.

Finally, the district court did not abuse its discretion in determining that, overall, the four preliminary injunction factors weigh in favor of granting the injunction. The State does not contest that Plaintiffs have suffered irreparable injury in the form of delays in medical treatment. Appellant Br. at 39. Courts routinely uphold preliminary injunctions where the alleged irreparable harm involves delay in or inability to obtain medical services and the party against

whom the injunction is issued claims that the injunction places significant costs on them. *See, e.g., Blum v. Caldwell*, 446 U.S. 1311, 1315–16 (1980) (declining to stay an injunction even though "counsel for petitioner estimated that the State will have to expend an additional $150 million per year in Medicaid benefits as a result of the decision below" because "[o]n the other side of the balance are the life and health of the members of this class:  persons who are aged, blind, or disabled and unable to provide for necessary medical care because of lack of resources"); *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 584 (6th Cir. 2006) (holding that the district court did not abuse its discretion in granting an injunction even though it "will place a substantial expense on the defendants" in part because "the plaintiffs would suffer irreparable harm without the injunction," including the possibility that "retirees [would] be[] unable to afford prescriptions or doctor visits").

Although the State claims that its resources would be better spent working with CMS to find solutions to delays faced by class members, it is not clear why the State cannot continue to work with CMS while also complying with the district court's injunction.  Nor does the fact that the State has taken some steps to remedy the problems faced by the class relieve it of its obligation to provide hearings that it is likely statutorily and constitutionally obligated to provide.  And as Plaintiffs note, some of the steps the State has taken occurred only after litigation commenced, even though Plaintiffs' counsel had met with the State prior to filing this lawsuit.  Appellee Br. at 45 (citing R. 53 (Hagan Decl. ¶ 5) (Page ID #669)).  Finally, neither of the cases cited by the State to support its argument that extra judicial deference to the State is warranted given that the ACA is relatively new are on point.  Neither involved a preliminary injunction, and both concerned deference to *an agency*'s interpretation of its own regulations or implementing statute.  *Power Reactor Dev. Co. v. Int'l Union of Elec., Radio & Mach. Workers*, 367 U.S. 396, 408 (1961); *Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 138 (2d Cir. 2002).

## IV.  CONCLUSION

For the reasons set forth above, we **AFFIRM** the district court's grant of a preliminary injunction.

---

**DISSENT**

---

SUTTON, Circuit Judge, dissenting. This injunction action is moot by any conventional measure. The eleven plaintiffs filed this class action in order to obtain determinations about whether they are eligible to obtain Medicaid benefits. Before the court certified the proposed class, the plaintiffs obtained a commitment from the State, through a bargained-for agreement between the parties, that the State would provide each of the named plaintiffs and 100 others of the plaintiffs' choosing with an eligibility determination. The State delivered on its promise. All eleven named plaintiffs received that determination and now all eleven are obtaining Medicaid benefits. The 100 other individuals obtained the sought-after determinations, and the vast majority of them now are receiving Medicaid benefits. (The others were not fully processed because the State had not received the proper documentation.) The plaintiffs asked and now have received. Because the plaintiffs received all of their requested injunctive relief before class certification, the case is moot. *Alvarez v. Smith*, 558 U.S. 87, 92–94 (2009); *Pettrey v. Enter. Title Agency, Inc.*, 584 F.3d 701, 703 (6th Cir. 2009).

Neither the court nor "[t]he parties . . . dispute that all eleven named plaintiffs' individual claims became moot before the district court certified the class." *Supra* at 7. The court offers two alternative grounds for nonetheless saving the case. With respect, I am not persuaded.

1. The first is that the "inherently transitory" nature of these claims keeps any mootness problems at bay. To meet this test, however, the claims must be so "fleeting" that "no plaintiff [will] possess[] a personal stake in the suit" long enough for the trial court "to rule on a motion for class certification." *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1531 (2013). The cause of action in other words must moot itself due to some inherent time limit in the nature of the claims that expires before class certification. *Accord County of Riverside v. McLaughlin*, 500 U.S. 44, 47–48 (1991). These Medicaid requests, however, will remain as alive as ever until the State processes the plaintiffs' applications—until, that is, the plaintiffs get what they asked for.

What makes these claims inherently transitory, the court responds, is *uncertainty* over whether the claims will remain pending through class certification—uncertainty sparked by the possibility in this case (and in any other) that the defendant will grant the relief requested. Yet that is not what makes a claim "inherently," as opposed to potentially, transitory. To inhere in something is to "exist as a permanent, inseparable, or essential attribute" of it. *Black's Law Dictionary* 902 (10th ed. 2014). As *Genesis* explains, inherently transitory claims are ones where "no plaintiff" will retain a live claim long enough to reach class certification. 133 S. Ct. at 1531. The question is whether the claim has a built-in expiration date. *See Susman v. Lincoln Am. Corp.*, 587 F.2d 866, 870 (7th Cir. 1978). That is not this claim, and it is not this case.

2. As an alternative explanation for saving this case, the court invokes a "picking off" exception to mootness. The idea is that defendants should not be able to avoid class actions by intentionally mooting the named plaintiffs' claims. But this consideration applies *after* the district court has ruled on a class-certification motion. *See Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339–40 (1980).

That is not this case. Whatever the merits of this debate one way or another *before* a district court rules on a class-certification motion, I doubt that it is advanced by pejorative or euphemistic labels. One person's "picking off" may be another person's "making whole." Civil Rule 68 indeed *encourages* the "picking off" and "making whole" of claims. It says that, if a plaintiff rejects a defendant's offer of judgment under Rule 68 and later receives a smaller award at trial, the plaintiff "must pay the costs" the defendant "incurred after the offer was made." Fed. R. Civ. P. 68(d). The point is to incentivize settlement, to deter protracted litigation, and in the process to advance Rule 1's goal of the "just, speedy, and inexpensive" resolution of "every action and proceeding." *See Marek v. Chesny*, 473 U.S. 1, 5 (1985). In the mine run of disputes with several alleged victims, it seems just as likely that the defendant who promptly offers to make claimants whole will encourage more claimants to file as not—if there is something to the claims. That is particularly so in cases like this one, where the plaintiffs may obtain attorney's fees if they prevail. *See* 42 U.S.C. § 1988. Yet if no other claimants step up to the plate, it is fair to ask whether the dispute calls for class action resolution, especially when fees remain available to encourage private enforcement of individual claims. How at any rate will named plaintiffs,

once made whole, be adequate, to say nothing of good and productive, representatives of a class of individuals who have not received their hearings?  Labels do not answer these questions in the context of a mootness inquiry that arises before the district court rules on a class-certification motion.

"Picking off" is an especially unhelpful label in this case.  The State did not limit its offer and provision of relief to the eleven named plaintiffs.  It offered relief to those plaintiffs *and 100 others* of the plaintiffs' choosing.  If that is evidence of the State's "actual motive" in the case, *supra* at 18, it would seem to be evidence of a *good* motive, not a bad one.

The court overstates in maintaining that our circuit has already established a "picking off" exception that saves this kind of case and others like it from mootness.  *Brunet v. City of Columbus*, 1 F.3d 390, 400 (6th Cir. 1993), says that "[s]ome courts" in other circuits have adopted this exception but that, even if such an exception did exist, it would not apply on the facts at issue there.  *Carroll v. United Compucred Collections, Inc.*, 399 F.3d 620, 625 (6th Cir. 2005), holds only that a Rule 68 offer of judgment does not moot a class action after a "Report and Recommendation ha[s] been issued by the magistrate judge recommending that a class be certified."  No such ruling occurred here.  Nor did *Blankenship v. Secretary of Health, Education, and Welfare*, 587 F.2d 329 (6th Cir. 1978), a case that predates *Roper* and *Genesis*, establish a broad picking-off exception in its one-paragraph analysis, as our later cases reveal.

I agree with the majority that class action issues like these present "considerable complexit[ies]."  *Supra* at 9 n.2.  For that reason, I would prefer to stick closely to our precedent and wait for further guidance from the Supreme Court before adding new mootness exceptions in this area.

The majority seeing things differently, I respectfully dissent.