RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0075p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

AELEN UNAN and PATRICIA QUINTINO, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants*,

*v.*

No. 16-1185

NICK LYON, in his official capacity as Director, Michigan Department of Community Health and Human Services,

*Defendant-Appellee*.

Appeal from the United States District Court for
the Eastern District of Michigan at Detroit.
No. 2:14-cv-13470—Marianne O. Battani, District Judge

Argued: November 29, 2016

Decided and Filed: March 31, 2017

Before: MOORE, SUTTON, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Anna M. Hill, MICHIGAN IMMIGRANT RIGHTS CENTER, Kalamazoo, Michigan, for Appellants. Joshua S. Smith, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Anna M. Hill, Susan E. Reed, MICHIGAN IMMIGRANT RIGHTS CENTER, Kalamazoo, Michigan, Marie K. DeFer, Edward J. Hoort, Veronica A. Perera, Lysa Postula-Stein, CENTER FOR CIVIL JUSTICE, Flint, Michigan, for Appellants. Jonathan S. Ludwig, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

MOORE, J., delivered an opinion in which WHITE, J., joined in part. WHITE, J. (pg. 19), delivered a separate opinion concurring in all but Part II.B.1 of the lead opinion. SUTTON, J. (pp. 20–25), delivered a separate dissenting opinion.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.   In the course of implementing certain changes required by the Patient Protection and Affordable Care Act of 2010 ("ACA"), the State of Michigan experienced a systemic computer problem that erroneously assigned thousands of non-citizens, who may have been eligible for comprehensive Medicaid coverage, to Emergency Services Only ("ESO") Medicaid.  Plaintiffs Aelen Unan and Patricia Quintino, two eligible non-citizen residents of Michigan who were erroneously assigned ESO coverage, filed a class action complaint against Nick Lyon, Director of the Michigan Department of Health and Human Services ("DHHS"), alleging violations of the Medicaid statute and the Due Process Clause of the Fourteenth Amendment.  On cross-motions for summary judgment, the district court found that actions taken by the State since the complaint was filed had resolved all systemic errors.  Finding plaintiffs' claims to be moot, the district court granted defendant's motion for summary judgment, denied plaintiffs' motion for the same, and dismissed as moot plaintiffs' motions for preliminary injunction and class certification.  Plaintiffs now appeal the district court's judgment. For the reasons set forth below, we hold that the plaintiffs' claims are not moot, and **REVERSE** the district court's grant of defendant's motion for summary judgment.  On the basis of grounds other than those relied upon by the district court, we **AFFIRM** the denial of plaintiffs' motion for summary judgment as to their claims that defendant failed to provide comprehensive Medicaid coverage and a reasonable opportunity to verify immigration status, and hold that there are fact issues precluding summary judgment for both plaintiffs and defendant.  We hold that defendant is entitled to judgment as a matter of law on the remaining notice claims, and we **REMAND** the case for further proceedings.

## I. BACKGROUND

In 1986, Congress made comprehensive Medicaid benefits available to eligible non-citizens who attest to having "satisfactory immigration status."  Pub. L. No. 99–603, § 121(a)(1), 100 Stat. 3359 (codified as amended at 42 U.S.C. §1320b–7(d)(4)(A)).  Non-citizen applicants are required to present verified documentation to prove their immigration status.  42 U.S.C.

§ 1320b–7(d)(2). If an individual attests to his or her status, but does not submit or verify the required documentation, state Medicaid agencies are required to provide that individual with a "reasonable opportunity" to provide documents verifying their eligible status. 42 U.S.C. § 1320b–7(d)(4)(A). In Michigan, DHHS[1] administers the state Medicaid program, which is known as the Healthy Michigan Plan. Appellee's Br. at 3.

On January 25, 2014, DHHS implemented various system changes required by the ACA. R. 22–6 (Hundley Aff. at 2) (Page ID #837). In the course of implementation, a systemic computer problem caused a number of applicants to be assigned automatically to ESO Medicaid, although they might otherwise be eligible for comprehensive coverage. Specifically, non-citizen applicants who attested to, but failed to verify, their immigration status were automatically denied comprehensive coverage, and approved for ESO coverage only. *Id.* at 3 (Page ID #838). Denial of comprehensive coverage occurred without a reasonable opportunity to provide documents verifying an applicant's eligible status. *Id.*

Among these applicants were named plaintiffs Unan and Quintino. Their cases are nearly identical. Unan, a refugee, applied for Medicaid on April 2, 2014. Quintino, who became a legal permanent resident in 1998, applied for Medicaid on April 1, 2014. Neither Unan nor Quintino was asked for documentation of her immigration status, although each had previously provided such proof of status for her food assistance case. Each received a Health Coverage Determination Notice indicating that she had been approved for ESO Medicaid. The letters did not include any language regarding denial of comprehensive Medicaid coverage. R. 28–3 (Health Care Determination Notices) (Page ID #976–83).

On September 8, 2014, Unan and Quintino filed a class-action lawsuit for declaratory and injunctive relief against Nick Lyon, the Director of DHHS,[2] alleging that defendant (1) failed promptly to provide comprehensive Medicaid to plaintiffs pursuant to 42 U.S.C. § 1396a(a)(8),

---

[1]Prior to April 10, 2015, the Michigan Department of Community Health and Department of Human Services administered the state Medicaid program. Appellee's Br. at ix n.1; *see* R. 22–6 (Hundley Aff. at 2) (Page ID #837). These Departments were subsequently merged by Executive Order 2015–4 into the new Michigan Department of Health and Human Services. Appellee's Br. at ix n.1.

[2]Originally two other state officers were named, but Nick Lyon, the current director of DHHS, has been substituted.

10(A) (Count I); (2) failed to provide comprehensive Medicaid to plaintiffs pending a reasonable opportunity to verify plaintiffs' immigration status pursuant to 42 U.S.C. §§ 1396a(a)(8), 1320b–7(d)(4)(A) (Counts II and III); and (3) failed to provide plaintiffs with adequate notice and a meaningful opportunity to be heard regarding the denial of comprehensive Medicaid pursuant to 42 U.S.C. § 1396a(a)(3) and the Due Process Clause of the Fourteenth Amendment (Counts IV and V). On the same date, plaintiffs filed a motion for preliminary injunction and a motion for class certification.

Two days after the complaint was filed, Unan and Quintino were both determined by DHHS to be eligible for comprehensive Medicaid coverage retroactive to April 1, 2014. On August 2, 2014, DHHS, while working to correct the systemic computer problem, began approving for full Medicaid individual applicants who attested to eligible immigration status. R. 22–6 (Hundley Aff. at 3) (Page ID #838). DHHS applied other temporary fixes throughout November, and by the end of December, had reprocessed well over 16,000 cases in addition to those corrected manually. R. 69–10 (Woods Aff., Exh. B at 2–3) (Page ID #1755–56). Defendant claims that a "permanent correction for the ESO issue" was implemented by December 30, 2014. R. 45 (Def. Reply in Support of First Mot. to Dismiss and/or for Summ. J. at 2) (Page ID #1216).

On March 24, 2015, the district court ordered the parties to prepare revised notices for Medicaid applicants, and held in abeyance plaintiffs' motions for preliminary injunction and class certification. R. 46 (Dist. Ct. Order Denying Mot. to Dismiss) (Page ID #1247–48). On July 23, 2015, the district court stayed discovery pending resolution of dispositive motions. Both parties filed cross-motions for summary judgment[3] on August 31, 2015, and a hearing was held on October 8, 2015. R. 69 (Def. Second Mot. to Dismiss and/or for Summ. J.) (Page ID #1624–73); R. 70 (Pls. Mot. for Summ. J.) (Page ID #1780–826). On January 11, 2016, the district court granted defendant's motion for summary judgment, denied plaintiffs' motion for summary judgment, and entered judgment for defendant. R. 83 (Dist. Ct. Order at 33) (Page ID #2443).

---

[3]Defendant filed its first motion to dismiss and/or for summary judgment on November 24, 2014, which was denied without prejudice on March 24, 2015. R. 30 (Def. First Mot. to Dismiss and/or for Summ. J.) (Page ID #1021); R. 46 (Dist. Ct. Order Denying Mot. to Dismiss) (Page ID #1247–48).

Plaintiffs' motions for class certification and preliminary injunction were dismissed as moot. Plaintiffs filed a timely notice of appeal.

## II. JURISDICTION:  Mootness

### A.  Standard of Review

This court reviews jurisdictional issues de novo.  *Demis v. Sniezek*, 558 F.3d 508, 512 (6th Cir. 2009).  It is well established that a federal court must determine jurisdictional questions before proceeding to the merits.  *Children's Hosp. Med. Ctr. of Akron v. Youngstown Assocs. in Radiology, Inc.*, 612 F. App'x 836, 837 (6th Cir. 2015) (*citing Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 111 (1998)).  The Supreme Court has made clear that Article III requires that "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."  *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (quotation marks omitted). A case may therefore become moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 396 (1980) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)).

Mootness doctrine, however, is "flexible" in the case of class actions.  *Wilson v. Gordon*, 822 F.3d 934, 942 (6th Cir. 2016) (quoting *Geraghty*, 445 U.S. at 400).  In general, "[o]*nce a class is certified*, the mooting of the named plaintiff's claim does not moot the action, [and] the court continues to have jurisdiction to hear the merits of the action if a controversy between any class member and the defendant exists."  *Brunet v. City of Columbus*, 1 F.3d 390, 399 (6th Cir. 1993).  Although dismissal is ordinarily required when the named plaintiff's claim becomes moot *before* certification, we have recognized some exceptions to this general rule.  *Wilson*, 822 F.3d at 942.  The plaintiffs argue that two such exceptions apply in this case, namely, the "picking off" exception and the "inherently transitory" exception.  Appellants' Br. at 39–47. We consider each in turn.

**B. Named plaintiffs' individual claims are not moot**

**1. "Picking off" exception**

The parties do not dispute that the named plaintiffs' individual claims became moot when, two days after the complaint was filed, they were approved for comprehensive Medicaid coverage retroactive to the date of their applications. Appellants' Br. at 36; Appellee's Br. at 23. Plaintiffs argue, however that defendant cannot avoid litigation by strategically "picking off" named plaintiffs and settling their individual claims. Appellants' Br. at 39.

The "picking off" exception was developed to prevent defendants from strategically avoiding litigation by settling or buying off individual named plaintiffs in a way that "would be contrary to sound judicial administration." *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980). We need not wait until after class certification has been denied to apply this exception. Our cases recognize this exception even when a motion for class certification is still pending, because "the defendant is on notice that the named plaintiff wishes to proceed as a class, and the concern that the defendant therefore might strategically seek to avoid that possibility exists." *Wilson*, 822 F.3d at 947; *see also Brunet*, 1 F.3d at 400 ("If a tender made to the individual plaintiff while the motion for certification is pending could prevent the courts from ever reaching the class action issues, that opportunity is at the mercy of a defendant, even in cases where a class action would be most clearly appropriate") (quoting *Susman v. Lincoln Am. Corp.*, 587 F.2d 866, 870 (7th Cir. 1978)).

We recently had an opportunity to address the "picking off" exception in *Wilson*, a case strikingly similar to the one before us. In *Wilson*, eleven named plaintiffs filed a class action complaint against various state officials charged with administering TennCare, Tennessee's Medicaid program. 822 F.3d at 940–41. The plaintiffs alleged that as a result of problems relating to ACA-mandated updates to TennCare's computer system, plaintiffs experienced delays in their Medicaid eligibility determinations and did not receive fair hearings on those delays. *Id.* at 941. A day before the hearing on class certification, the State enrolled all named plaintiffs, as well as 100 other class members, in TennCare. *Id.* We held that the "picking off" exception applied, and pointed to the timing and method of relief to support our conclusion. *Id.* at 950–51.

Specifically, we found it relevant that the individual claims were mooted on the eve of a hearing on the motion for class certification, and not before filing, despite the fact that plaintiffs had brought four similar cases to the State's attention before the lawsuit was filed. *Id.* at 950 ("The exact timing of when the last claim of a class member identified by Plaintiffs was mooted . . . would also support a finding of motive."). Moreover, we noted that the claims did not become moot "through an established, standard procedure such that it might more clearly be characterized as 'incidental' or 'a matter of standard operating procedure.'" *Id.* (citations omitted). Rather, "the State created a new, ad hoc process," providing further support for the inference that the state was attempting to avoid a class action. *Id.* at 951.

There is sufficient evidence to support applying the "picking off" exception in this case. As was the case in *Wilson*, the timing here is suspect. The individual claims of the named plaintiffs were not resolved until after the lawsuit and contemporaneous motion for class certification were filed, despite the fact that the State, by its own admission, became aware of the systemic issue as early as April 14, 2014, nearly five months prior to the initiation of this action. R. 22–6 (Hundley Aff. at 3) (Page ID #838). Defendant also quickly moved to moot the claims of Maria Vargas, a putative class member, as soon as she was identified in a motion to intervene as a potential representative. Appellants' Br. at 42. Although Vargas's claim was immediately resolved, her husband, who applied as a member of the same household on the same date as his wife, did not receive relief until a month later, when plaintiffs' counsel informed DHHS that Vargas's husband was in need of medical services not available through ESO. R. 31–2 (Emails from Counsel at 2) (Page ID #1091). The exact timing of when these claims were mooted supports a finding that defendant was strategically seeking to avoid litigation by selectively resolving the claims of any potential representatives as soon as they became known to defendant.

Nor can defendant demonstrate that plaintiffs' claims became moot through an established, standardized procedure.[4] The failure simultaneously to resolve the claims of all

---

[4]The dissent argues that the exception should not apply because DHHS "'picked off' the entire putative class—which is to say it gave everyone just what they wanted." The evidence suggests otherwise. Although DHHS claims to have implemented a systemic fix, the relief granted to the individual named plaintiffs was granted on an ad hoc basis, and, as the case of Maria Vargas demonstrates, was directed *only* at those individuals identified as potential class representatives. In all cases, DHHS moved to grant specific relief only once it was put on notice that

members of the Vargas household is evidence of this.  *See* Appellants' Br. at 42.  Rather, defendant, like the defendants in *Wilson*, created a new ad hoc process and mooted the individual named plaintiffs' claims on a case-by-case basis after they were identified in this lawsuit. *Wilson*, 822 F.3d at 951.  Although the dissent asserts that DHHS implemented a systemic fix alongside these ad hoc changes, the fact remains that not one of the individuals identified as a named plaintiff or potential named plaintiff was granted relief on the basis of a systemic fix.  As was the case in *Wilson*, "the State in this case did not moot Plaintiffs' claims through an established, standard procedure such that it might more clearly be characterized as 'incidental' or 'a matter of standard operating procedure.'"  *Id.* at 950 (citations omitted).  The "picking off" exception therefore should apply in this case.

### 2. "Inherently transitory" exception

Plaintiffs next claim that the "inherently transitory" exception to mootness also applies in this case.  In order for this exception to apply, two requirements must be met.  First, the injury must be "so transitory that it would likely evade review by becoming moot before the district court can rule on class certification."  *Wilson*, 822 F.3d at 945.  Second, it must be clear that "other class members are suffering the injury."  *Id.*

Plaintiffs clearly satisfy the first requirement.  The key inquiry for assessing whether something is transitory is not merely how long a claim is likely to remain active.  Rather, "the crux of the 'inherently transitory' exception is the uncertainty about the length of time a claim will remain alive."  *Gawry v. Countrywide Home Loans, Inc.*, 395 F. App'x 152, 158–59 (6th Cir. 2010) (citation omitted).  Where a state may quickly and unilaterally grant relief to an individual once litigation begins, we have found that a claim may be transitory even where the claim could theoretically remain live for weeks, if not months.  *Wilson*, 822 F.3d at 945.  In *Wilson*, we applied the inherently transitory exception to a similar class of plaintiffs, whose claims for a hearing on Medicaid eligibility could be resolved quickly by the state Medicaid agency.  *Id.* at 947.  As was the case in *Wilson*, a named plaintiff in this case does not know whether her case will remain alive sufficiently long to enable a district court to certify a class.

---

a particular individual could represent the class, which raises "the concern that the defendant therefore might strategically seek to avoid" the possibility of a lawsuit.  *Wilson*, 822 F.3d at 947.

*Id.* at 946.   Where resolution involves such uncertainty, we conclude that the injury is "so transitory that it would likely evade review." *Id.* at 945.

Plaintiffs also satisfy the second requirement.   Affidavits submitted by defendant demonstrate that hundreds of erroneous assignments to ESO occurred after DHHS claimed to have implemented a permanent fix in December 2014.  R. 58–3 (Roderick Aff. at 3–4) (Page ID #1382–83); R. 69–2 (Suppl. Roderick Aff. at 3) (Page ID #1679).   Through August 2015, plaintiffs' counsel had referred ninety additional individuals who had received erroneous ESO assignments.   Appellee's Br. at 48.   Moreover, plaintiffs have put forth evidence that these assignments occurred as a result of systemic, rather than human, error. *See, e.g.*, R. 70–14 (June 2015 Def. Emails at 11) (Page ID #1997); R. 70–10 (July 2015 Def. Emails) (Page ID #1983–84); R. 70–11 (May 2015 Def. Emails) (Page ID #1985–87); R. 70–12 (June 2015 Def. Emails) (Page ID #1988–90).  Although courts may not demand perfection from agencies implementing complex programs, the evidence here indicates the persistence of a systemic problem.   Here, regular, periodic misassignment of hundreds of individuals continued to occur despite DHHS's claims that a systemic fix was in place.   Under these circumstances, it is clear that "other class members are suffering the injury" that Unan and Quintino experienced. *Wilson*, 822 F.3d at 945. We therefore conclude that the "inherently transitory" exception applies here.

## C.  The putative class claims are not moot

### 1.  Notice claims

Defendant makes two mootness claims that pertain to the class as a whole.   First, defendant states that the claims of the proposed "notice class" are moot because notices were mailed out alerting applicants of their right to appeal.  R. 69 (Def. Second Mot. to Dismiss and/or for Summ. J. at 8–10) (Page ID #1645–47).

As to the notice claims, the parties agree that the only remaining issue for the proposed notice class concerns the retroactive notices sent to individuals assigned to ESO from January 2014 to May 2015.  Appellants' Br. at 56; Appellee's Br. at 8.  Plaintiffs claim that the notices mailed out to these individuals violate the class members' due-process rights.  Specifically, they argue that the notices are inadequate because they do not inform applicants about the specific

time period during which they may have been erroneously assigned to ESO, and are therefore insufficient to alert individuals as to the precise questions relating to their eligibility. Appellants' Br. at 56–57.

Plaintiffs' claims are not mooted by virtue of the simple fact that the notices were sent out. The issue of the adequacy of the notices sent out goes to the merits of the notice claims, not to mootness. *See infra* Part III.C (addressing merits of notice claims). If the language contained in the notices failed to meet federal statutory or constitutional standards, the class members would continue to suffer that harm whether or not these letters were received from DHHS. Because the claims of the class are still "live," the notice claims are not moot. *See Geraghty*, 445 U.S. at 396.

## 2. Claims of erroneous assignments caused by systemic error

Defendant next contends that the remaining claims of the class are moot because of DHHS's subsequent efforts to remedy the errors that caused Unan's and Quintino's injuries. R. 69 (Def. Second Mot. to Dismiss and/or for Summ. J. at 12–15) (Page ID #1649–52). Defendant maintains that the systemic problem has been fixed, and that any subsequent errors occurred as a result of normal worker error. *Id.* at 12–13 (Page ID #1649–50).

"It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). In order to establish that a case is moot, the party asserting mootness "bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 190 (2000).

Here the "wrongful behavior" at issue is not *any* erroneous assignment of a non-citizen to ESO Medicaid. The law does not require that a state Medicaid agency implement a flawless program. *See Frazar v. Gilbert*, 300 F.3d 530, 544 (5th Cir. 2002) ("Perfect compliance with such a complex set of requirements is practically impossible, and we will not infer congressional intent that a state achieve the impossible"), *rev'd on other grounds*, *Frew v. Hawkins*, 540 U.S. 431, 436 (2004). Rather, we consider whether it is absolutely clear that a systemic computer

problem of the type that caused Unan's and Quintino's injuries could not reasonably be expected to recur.

Defendant failed to put forward sufficient evidence to meet this standard. Although there is evidence that DHHS took significant steps to correct the systemic problem, evidence of substantial compliance does not moot a case unless it is "absolutely clear" that the violations could not reasonably recur. *See Laidlaw*, 528 U.S. at 193 (holding that defendant's "substantial compliance with its permit requirements[] might moot the case[] but . . . only if . . . these events made it absolutely clear that [defendant's violations] could not reasonably be expected to recur."). Here, defendant argues that by the end of December 2014, over 16,000 cases were reprocessed and corrected. Appellee's Br. at 7. He points to affidavits from DHHS officials stating that "all systemic issues identified to date [had] been corrected." R. 69–2 (Suppl. Roderick Aff. at 4) (Page ID #1680).

Plaintiffs, on the other hand, argue that there is evidence in the record to support the inference that systemic errors continued to occur after December 2014, when defendant claimed to have fixed the systemic issue. Plaintiffs point, in particular, to one email dated June 22, 2015, six months after the purported permanent fix:

> [t]his case keeps flipping from full MA to ESO, we have the alien card but when we put it in it reverts to ESO . . . We have a few of these that we know of and we are calling them in today but there are probably more that we don't know about as the some [sic] workers are not checking the type of MA being approved and we don't find out until the client calls. This case has everything correct on it and still is approving ESO.

R. 70–14 (June 2015 Def. Emails at 11) (Page ID #1997). Additional emails from 2015 discuss erroneous assignments to ESO and the need to apply overrides to resolve those errors. R. 70–11 (May 2015 Def. Email at 1–2) (Page ID #1986–87); R. 70–10 (July 2015 Def. Email at 21) (Page ID #1984); R. 70–12 (June 2015 Def. Email at 84) (Page ID #1989).

Plaintiffs also point out that hundreds of erroneous assignments occurred after the system was declared by DHHS to be permanently fixed in December 2014. Appellants' Br. at 51–52. R. 58–3 (Roderick Aff. at 3–4) (Page ID #1382–83); R. 69–11 (Nelson Aff., Exh. at 1–5) (Page ID #1762–66). For example, from December 11, 2014 through May 18, 2015, 898

individuals were erroneously assigned to ESO Medicaid.  R. 58–3 (Roderick Aff. at 3–4) (Page ID #1382–83).  From May 19, 2015 to August 14, 2015, 246 individuals were erroneously assigned to ESO.  R. 69–2 (Suppl. Roderick Aff. at 3) (Page ID #1679).

Given the evidence on the record, we cannot say that it is "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  *Laidlaw*, 528 U.S. at 190. Although DHHS has apparently undertaken significant efforts to remedy this problem, the effect of these fixes on the prospect of future violations is a factual dispute that remains open.  *Id.* at 193 (holding a case was not moot where "[t]he effect of [defendant's substantial] compliance and the facility closure on the prospect of future violations is a disputed factual matter.").  The district court erred in concluding that the claims of the putative class are moot, and we reverse its grant of defendant's motion for summary judgment.

### III.  ANALYSIS:  Summary Judgment

### A.  Standard of Review

We review de novo a district court's grant of summary judgment.  *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488, 492 (6th Cir. 2005).  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  The district court must view the facts and draw all inferences "in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted).

### B.  Erroneous assignments in violation of the Medicaid statute

After correctly determining that a court could provide plaintiffs with only prospective relief to prevent an ongoing violation of federal law, R. 83 (Dist. Ct. Order at 8) (Page ID #2418), the district court denied plaintiffs' motion for summary judgment because "there are no potential plaintiffs remaining to whom it could issue prospective relief," *id.* at 30 (Page ID #2440).  As explained above, the district court erred in holding that the claims of the entire putative class were moot.  However, because plaintiffs failed to demonstrate that there is no genuine dispute of material fact as to whether defendant's ongoing pattern and practice violates

the Medicaid statute, we affirm the district court's denial of plaintiffs' motion for summary judgment as to the claims that defendant failed promptly to provide comprehensive coverage indefinitely, failed to provide comprehensive coverage pending a reasonable opportunity to verify immigration status, and failed to provide non-citizens a reasonable opportunity to verify immigration status. With respect to these claims, genuine disputes concerning material facts remain, and thus summary judgment for both sides is inappropriate.

In their motion for summary judgment, plaintiffs contend that there is no genuine dispute that defendant's ongoing pattern and practice violates the Medicaid statute by failing timely to provide to non-citizens comprehensive Medicaid coverage or a reasonable opportunity to verify their immigration status. R. 70 (Pls. Mot. for Summ. J. at 8–23) (Page ID #1801–16). Plaintiffs have put forth some evidence that a systemic issue persists. A June 22, 2015, internal DHHS email indicates that at least six months after the purported permanent fix, those employed by the agency continued to observe the computer system "flipping [cases] from full [Medicaid] to ESO," which led at least one worker to believe "there are probably more that we don't know about as the some [sic] workers are not checking the type of [Medicaid] being approved and we don't find out until the client calls." R. 70–14 (June 2015 Def. Emails at 4) (Page ID #1997). Contrary to defendant's contention that subsequent errors were caused by worker error, additional emails suggest a problem with "Bridges," the computer system used to process information and determine Medicaid eligibility. *See* Appellee's Br. at 7. For example, a June 23, 2015 email stated that Bridges had assigned an applicant to ESO despite documentation that supported full coverage, and that "Bridges continues to error this case out." R. 70–12 (June 2015 Def. Email at 84) (Page ID #1989). Another email from July 13, 2015, noted the "problems . . . caused by Bridges auto certifying Medicaid cases," including problems related to ESO coverage. R. 70–10 (July 2015 Def. Email at 21) (Page ID #1984).

Moreover, plaintiffs put forth facts demonstrating that numerous individuals were erroneously assigned to ESO even after the purported permanent fix to the systemic errors was implemented in December 2014. Appellants' Br. at 52; R. 58–3 (Roderick Aff. at 3–4) (Page ID #1382–83); R. 69–11 (Nelson Aff. at 5–9) (Page ID #1762–66); R. 69–2 (Suppl. Roderick Aff. at

3) (Page ID #1679).   From the evidence presented, it appears that hundreds of erroneous assignments routinely occurred after the systemic issues were declared by DHHS to be fixed.

Through affidavits, defendant denies that a systemic computer problem exists, and argues that the remaining erroneous assignments are a result of human error.  R. 69–2 (Suppl. Roderick Aff. at 4 (Page ID #1680).  He argues that the low error rate observed since the permanent fix supports the inference that erroneous assignments are caused merely by worker error.

Plaintiffs have failed to demonstrate that they are entitled to judgment as a matter of law on this issue.  Drawing all inferences in the light most favorable to the defendant on plaintiffs' motion for summary judgment, we must conclude that plaintiffs cannot definitively demonstrate that defendant's current patterns and practices violate the Medicaid statute.  Although internal DHHS emails suggest that systemic errors persist, the language of these emails is speculative.  For example, in the June 22, 2015 email, the worker's suspicion that "there are probably more" erroneous assignments caused by a computer error is informed only by her personal experience of entering data into the system.  R. 70–14 (June 2015 Def. Emails at 11) (Page ID #1997).  Although plaintiffs can point to hundreds of erroneous assignments since the purported "permanent fix," they have not put forth sufficient evidence to rebut defendant's claim that these were the result of worker error.  Based on the evidence before us, we conclude that there is a genuine dispute of material fact with regard to plaintiffs' claims that defendant, as a result of DHHS's ongoing patterns and practices, failed to provide comprehensive coverage or a reasonable opportunity to verify immigration status (Counts I, II, III).  We emphasize that the presence of this genuine dispute of material fact means that summary judgment should not be awarded either to plaintiffs or to defendant.

## C.  Notice Claims

Since the commencement of this action, the parties have resolved many of the notice issues indicated in the complaint, including through revised notices sent to individuals assigned to ESO Medicaid on or about May 4, 2015 and onward.  *See* Appellants' Br. at 20; Appellee's Br. at 7–8.  The remaining issue on appeal concerns retroactive notices for individuals assigned

to ESO Medicaid between January 2014 and May 2015. R. 69–4 (Chrysler Aff. at 6) (Page ID #1706).

Plaintiffs argue that they are entitled to summary judgment because the retroactive notices do not include the specific dates the individual was assigned to ESO Medicaid, and that the notices therefore do not adequately inform applicants about the precise questions raised about their eligibility. Appellants' Br. at 57; *see* R. 69–4 (Chrysler Aff., Exh. A at 1) (Page ID #1706) ("Our records show that you have or had Emergency Services Only (ESO) Medicaid between January 2014 and May 2015.").

In the context of the denial of public benefits, due process requires that the individual receive "timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally." *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970). Due process, however, "is flexible and calls for such procedural protections as the particular situation demands." *Rosen v. Goetz*, 410 F.3d 919, 928 (6th Cir. 2005) (*quoting Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)). In considering whether due process is met, therefore, we weigh the private interest at stake; "the risk of an erroneous deprivation"; the government's interest, including the burden of imposing additional procedural requirements; and "the probable value, if any, of additional or substitute procedural safeguards." *Mathews*, 424 U.S. at 335.

The retroactive notices clearly indicate the reason for the denial of full Medicaid coverage. The letter states that the applicant was "denied full Medicaid coverage because we did not have information about your immigration status that showed you qualified for full Medicaid, or, according to the information we did have about your immigration status, you were not eligible for full Medicaid." R. 69–4 (Chrysler Aff., Exh. A at 1) (Page ID #1706). It also offers an opportunity for a hearing, provides specific instructions as to how the individual can appeal the decision, and attaches a copy of a Hearing Request form. *Id.* The enclosed form is pre-populated with the precise reason the individual is seeking the appeal. *Id.* at 2 (Page ID #1707).

In light of this evidence, we conclude that there is no genuine dispute of material fact with regard to plaintiffs' notice claims, and that defendant is entitled to judgment as a matter of

law.   Although the private interest here is high, the notices alleviate the risk of erroneous deprivation by alerting Medicaid applicants of their right to a hearing and enclosing copies of the hearing form.   The enclosed form includes the precise reason the individual is seeking the appeal, which decreases the possibility of confusion over the appeals process.   Although plaintiffs argue that the notices deny due process by failing to specify the particular time period when the individual was erroneously assigned to ESO, the burden on the government of providing such individualized notices would be high, and such individualized notices would confer a minimal benefit on individuals who have already received past notices regarding ESO coverage.   Plaintiffs have put forward no evidence demonstrating that knowledge of the specific time period is necessary to the appeals process, or that the time period would not be easily discoverable by the individual from past notices.

The retroactive notices do not violate due process.   We therefore hold, on grounds other than those relied upon by the district court, that defendant is entitled to judgment as a matter of law on plaintiffs' notice claims (Counts IV and V).

## IV.  ANALYSIS:  Discovery

Plaintiffs contend that the district court erred in holding discovery in abeyance in the middle of the scheduled discovery period.   They failed, however, to file a motion or affidavit under Federal Rule of Civil Procedure 56(d), or otherwise to make specific objections or statements to the district court that additional discovery was required.   Because plaintiffs failed properly to preserve this issue, we cannot conclude that the district court abused its discretion by not allowing additional time for discovery.

Federal Rule of Civil Procedure 56(d) states that:

[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:  (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order.

We have observed that filing an affidavit that complies with Rule 56(d) is essential, and that in the absence of such a motion or affidavit, "this court will not normally address whether there was adequate time for discovery." *Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1196 (6th

Cir. 1995). Generally, this filing must "indicate to the district court its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000). However, a formal affidavit may not be required "when a party has clearly explained its need for more discovery on a particular topic to the district court prior to or contemporaneously with the motion for summary judgment." *United States v. Rohner*, 634 F. App'x 495, 504 (6th Cir. 2015) (*citing Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 627–28 (6th Cir. 2002)).

Plaintiffs argue that they suggested the need for further discovery on multiple occasions prior to the district court's decision to hold discovery in abeyance. They point, for example, to their response to defendant's motion to strike or for protective order, where plaintiffs stated that "there are still questions as to the *ongoing extent* of Defendant's pattern and practice," and that plaintiffs would therefore "need discovery concerning the allegations in Plaintiffs' Class Complaint and the defenses raised in Defendant's answer." R. 67 (Pls.' Br. in Resp. to Mot. to Strike at 9–10) (Page ID #1476–77). However, just ten days after this filing, plaintiffs filed their own motion for summary judgment. At a later hearing, plaintiffs informed the court that:

> plaintiffs believe that summary judgment could be granted for the plaintiffs on the facts that we know at this time, but if it this Court believes that it's essential to know exactly what has caused these errors . . . we don't have the full knowledge of that cause.

R. 87 (Mot. Hr'g Tr. at 15) (Page ID #2463).

Plaintiffs failed to object contemporaneously to the district court's decision to hold discovery in abeyance. R. 94 (Pretrial Conf. Tr. at 36–37) (Page ID #2715–16). At oral argument in this court, plaintiffs conceded that they did not indicate to the district court a particular person to be deposed or documents to be produced that were necessary for the fair adjudication of this case.

Plaintiffs here have failed to comply not only with the formal requirements of Rule 56(d), but also its substance. *See Rohner*, 634 F. App'x at 504–05. We therefore cannot conclude that the district court abused its discretion in holding discovery in abeyance pending the resolution of

dispositive motions. On remand, the district court may revisit the propriety of further discovery in light of the issues presented after this appeal.

## V. CONCLUSION

Based on the foregoing, we hold that the plaintiffs' claims are not moot, and **REVERSE** the district court's grant of defendant's motion for summary judgment. On the basis of grounds other than those relied upon by the district court, we **AFFIRM** the denial of plaintiffs' motion for summary judgment as to their claims that defendant failed to provide comprehensive Medicaid coverage and a reasonable opportunity to verify immigration status, and hold that there are fact issues precluding summary judgment for both plaintiffs and defendant. We hold that defendant is entitled to judgment as a matter of law on the remaining notice claims, and we **REMAND** the case for further proceedings.

---------

**CONCURRING IN PART**

---------

HELENE N. WHITE, Circuit Judge, concurring in part. I agree with Judge Sutton that if the district court correctly determined that the state had already granted the relief sought—compliance with the Medicaid statute as to all putative class members, subject to a de minimis error rate—then the court correctly dismissed plaintiffs' erroneous-assignment claims as moot. On this record, however, there is a genuine dispute whether that class-wide relief had been granted.

Defendant attributes any ongoing erroneous assignments of emergency-services-only Medicaid (ESO) to human error. But plaintiffs produced an email showing that even after the state implemented a permanent fix to its computer system, the system "flipped" multiple applicants who were eligible for full Medicaid to ESO coverage, and did so despite human attempts to correct the misassignment. Def. Emails, R. 70-14, PID 1997. I also agree with Judge Sutton that the possibility of future mistakes is not enough to avoid mootness. Here, however, the record sufficiently suggests an existing and continuing problem in the state's computer system. This contrasts with occasional human error consisting of one-off mistakes, which must be expected in any large, complicated government program. The state cannot be expected to operate its Medicaid enrollment process flawlessly, but it can be expected to cure continuing problems, such as its system erroneously "flipping" applicants from full Medicaid to ESO coverage. Plaintiffs thus established a genuine dispute of material fact regarding whether the state had complied with the Medicaid statute and had granted the plaintiff class complete relief. For this reason, I join in Judge Moore's "inherently transitory" analysis. *See* Lead Op. at 8–9.

I do not, however, join in Part II.B.1, which concludes that the "picking off" exception also applies. I am not convinced the record establishes that exception, and find it unnecessary to reach the issue given that the "inherently transitory" exception applies.

I concur in the remainder of Judge Moore's opinion for the reasons stated therein.

————————

**DISSENT**

————————

SUTTON, Circuit Judge, dissenting. This case is moot. Unan and Quintino filed this lawsuit to require Michigan to fix an error in its computer system that assigned non-citizens to the wrong Medicaid eligibility category. Michigan has done just that. Unan and Quintino also asked Michigan to provide them and the members of a putative class Medicaid benefits and constitutionally adequate notice. Michigan has done that too—for *every* member of the putative class. At this point, Unan and Quintino cannot identify a single immigrant covered by their putative class action to whom the State should be providing benefits but is not.

The explanation for the plaintiffs' request to continue the case at this point is not that the State will change its mind and undo the fix to its computer system. It's that the State *may* make another mistake in the future in allocating these benefits. The premise is accurate; the conclusion is not. No public agency, including this court, can insulate itself from the possibility of future mistakes. If the possibility of future mistakes suffices to invoke the "picking off" and "inherently transitory" exceptions to mootness, I am hard pressed to understand when they would not apply to the implementation of an ongoing benefits program. Instead of "narrow" exceptions to the mootness doctrine, *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975), they would become Article III overrides, sufficiently elastic to apply *whenever* this or that claimant wanted to apply them. No State can guarantee that its computer systems will operate flawlessly for every applicant, whether immigrant or citizen, and correctly assign Medicaid benefits. That is an unclimbable mountain. I would follow Judge Battani's lead, dismiss this case as moot, and reject the plaintiffs' reliance on the "picking off" and "inherently transitory" exceptions to mootness. The majority seeing it otherwise, I respectfully dissent.

The "picking off" exception to mootness does not apply in this instance for a straightforward reason. Michigan did not "strategically avoid[] litigation by settling or buying off *individual* named plaintiffs." Lead Op. at 6 (emphasis added). It "picked off" the entire putative class—which is to say it gave everyone just what they wanted. If that's what we call "picking off," I doubt there is a potential claimant in the country that would object to it. Since

when, moreover, is it the business of the federal courts to punish, or to be suspicious about, this form of state action? Michigan fixed the computer problem that "wrongfully den[ied] comprehensive Medicaid, and instead assign[ed] ESO [Emergency Services Only] Medicaid, to eligible Michigan residents who are qualified aliens" by the end of 2014. R. 1 at 47. And by April 2015, the Michigan Department of Community Health and Human Services had reprocessed thousands of Medicaid applications and retroactively given full Medicaid benefits to the 2,895 individuals whom the Department had moved to Emergency Services Only coverage but had not yet sent revised notices to. The Department began mailing revised notices, which Unan and Quintino accept as constitutionally adequate, to new Emergency Services Only recipients on May 4, 2015. That's all the complaint asked for. Once received, that relief required an Article III court to dismiss the case as moot, just as the district court correctly did.

The exception also does not apply for a second reason. The Supreme Court has applied the exception only *after* the district court has ruled on class certification, not before. *See Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339–40 (1980). The lead opinion's application of the "picking off" exception overlooks the reason that the Supreme Court considered that concern in the first place: to "[p]ermit[] appeal of the district court's certification ruling." *Id.* at 339. In this case, there is no certification ruling and no remaining member of the putative class either. The Department made the putative class whole; it didn't "pick off" a few named plaintiffs to prevent review of a class-certification order.

*Wilson v. Gordon*, 822 F.3d 934 (6th Cir. 2016), does not lead to a contrary result. In that case, Tennessee limited its actions to named plaintiffs and a small portion of the putative class. *Id.* at 941. In this case, Michigan granted relief to the entire putative class. That's called capitulation, not maneuvering—a surrender, not a strategic retreat. The idea behind the "picking off" exception is the risk of "invit[ing] waste of judicial resources by stimulating successive suits brought by others claiming aggrievement." *Roper*, 445 U.S. at 339. How is that a risk here? Neither the plaintiffs nor the lead opinion can identify a single putative class member who remains aggrieved.

Nor is the timing of relief suspect. Hundreds of thousands of Michigan residents became eligible for Medicaid for the first time on April 1, 2014. While struggling to process the influx

of applications, the Department became aware of problems with the computer system on April 14, 2014, and immediately began to correct the issue for all applicants. The Center for Civil Justice contacted the Department about the issue, and the Department promised to fix the problem by the end of the year and to use a manual override to provide Medicaid benefits to eligible residents in the meantime. By August 3, 2014, the Department had implemented a short-term fix to the computer systems so that post-August 3 applicants claiming eligible immigration status received full Medicaid and an opportunity to dispute any contrary assignment. All of that happened *before* Unan and Quintino filed this lawsuit.

When the plaintiffs sued the Department, Michigan promptly gave Unan and Quintino comprehensive Medicaid benefits. The Department did the same for any eligible individual, whether Maria Vargas, her husband, or anyone else who notified the Department of an error.

True, the Department restored benefits to these individuals on an ad hoc basis. True also, that happened in one sense in *Wilson*. But in contrast to *Wilson*, where a new ad hoc process for a limited slice of the putative class was the *only* procedural change the State made, the Department's ad hoc reassignments took place alongside *an ongoing and comprehensive* computer system fix. 822 F.3d at 951. Michigan has fixed the computer system and reprocessed all of the applications through this established, standardized procedure. On this record, no one who should be receiving benefits is not receiving benefits. What more can plaintiffs or the court fairly ask of the State? And what good would it do to wait to run the named and potential plaintiffs' applications back through the now fixed computer system? To apply the "picking off" exception here, it seems to me, runs the risk of turning it into a caricature and encourages defendants to delay relief until the comprehensive fix is already in place. The reality that the Department initially granted a few applicants relief on a case-by-case basis does not grant us jurisdiction over this class action years after plaintiffs received all of the benefits they asked for and were entitled to, and years after the Department had established a standardized procedure to deal with similar concerns.

The "inherently transitory" exception fares no better. *Wilson* identified two requirements for applying this exception: "(1) that the injury be so transitory that it would likely evade review by becoming moot before the district court can rule on class certification, and (2) that it is certain

other class members are suffering the injury." *Id.* at 945. Tennessee conceded the second requirement in *Wilson*. But Michigan challenges it here. And it's the failure to meet the second requirement that should end this case. Unlike *Wilson*, where Tennessee provided speedy Medicaid determinations only for the named plaintiffs and 100 individuals of their choosing, *id.*, the Department has resolved the computer issues for all putative class members and sends adequate notice to all new applicants with indeterminate immigration status.

The record evidence since the computer fixes bear this out. From May 19, 2015 to August 14, 2015, the Department received 150,641 Medicaid applications for 230,217 individuals. It assigned Emergency Services Only for just 3,595 cases and 4,378 individuals. "218 of the cases, affecting 246 individuals, were erroneously assigned ESO," which means that "[0].015% of total Medicaid applications resulted in an erroneous ESO assignment and [0].011% of individuals seeking Medicaid were erroneously assigned ESO. . . . Looking only at the ESO assignments, 6.1% of ESO case assignments were erroneous and 5.6% of ESO assignments for individuals were erroneous." R. 69-2 at 4–5. At oral argument, Unan and Quintino acknowledged that they could not point to any putative class member still affected by the glitch in the computer system. By all accounts, the targeted error thus no longer exists. On what basis, then, can we reverse Judge Battani's decision? None, at least that I can see.

Even though Judge White shares many of my concerns about applying the inherently transitory exception here, she nonetheless believes that the case is not moot because "plaintiffs produced an email showing that even after the state implemented a permanent fix to its computer system, the system 'flipped' multiple applicants who were eligible for full Medicaid to ESO coverage." Concurring Op. at 19 (quoting R. 70-14 at 4). The citation refers to immigrants from two countries, Cuba and Haiti, that apparently had difficulty with the computer system in June 2015. But there is no evidence that the Department failed to correct this error as well—and no evidence that any immigrants from these countries owed benefits are not getting them. No less importantly, this is not a class action on behalf of Cuban and Haitian immigrants, and indeed none of the named plaintiffs comes from Cuba or Haiti. This is a class action on behalf of all immigrants from all countries. At most, this email (but for the other problems) might permit the

continuation of a class action on behalf of immigrants from Cuba and Haiti. But that is not what the majority opinion says or what Judge White proposes.

That human error may lead to future erroneous assignments or computer code mistakes does not justify a lawsuit that seeks a never-ending injunction. Otherwise, *City of Los Angeles v. Lyons*, 461 U.S. 95, 109–12 (1983), would have come out differently. *Lyons* rejected as unduly speculative (for Article III purposes) a request for a future injunction against a police department's use of chokeholds by an individual improperly subjected to a chokehold by officers from that department before. Today's injunction—to obey the relevant statutes and constitutional provisions in the future—looks a lot like the one rejected in *Lyons*. In truth, it is even broader. The injunction instructs the Department "broadly to obey the statute" and the Constitution "and thus subject[s] the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to" the original computer system error. *NLRB v. Express Publ'g Co.*, 312 U.S. 426, 435–36 (1941).

The setting of this injunction makes it particularly hard to accept. It is inevitable that errors will occur in implementing any complex benefits programs. Just look at the Social Security program. *See, e.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 346 n.29 (overall error rate of 12.2% for Social Security disability benefits program). Or consider the challenges of implementing the national healthcare law. Yet Unan and Quintino, as their counsel acknowledged at oral argument, don't believe *any* error rate, whether 10% or 0.00001%, would demonstrate that the Department has resolved the "systemic errors" in Michigan's Medicaid benefits program. If that's the case, this lawsuit has no end. The "systemic error" is the fact that no one person, and thus no one computer system, is beyond reproach. That's not enough to maintain a case or controversy in any setting. And it's assuredly not enough to maintain one in this setting—where the Department has given Unan and Quintino everything they asked for.

The same goes for the notice claims. Federal courts may overcome a State's sovereign immunity only with prospective injunctions, *see Ex parte Young*, 209 U.S. 123, 159 (1908), and Michigan has been issuing revised notices, concededly constitutional, since May 2015. There is no plausible argument that Michigan will revert back to the old notices or reinsert the same computer error that it spent months fixing. *See Friends of the Earth, Inc. v. Laidlaw Envtl.*

*Servs.*, 528 U.S. 167, 190 (2000). At any rate, we must treat the voluntary "cessation of the allegedly illegal conduct by government officials . . . with more solicitude . . . than similar action by private parties." *Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir. 1990) (quotation omitted). The notice claims, like the Medicaid benefits claims, are moot. And even if the belatedly raised retroactive notice issue remained live and unaffected by Michigan's sovereign immunity, the court agrees that the retroactive notices do not violate due process. *See* Lead Op. at 15–16.

If the "inherently transitory" exception to mootness allows us to sidestep these realities, and if it applies to "systemic errors" without any built-in expiration dates, I am concerned. The exception was designed to "focus[] on the fleeting nature of the challenged conduct giving rise to the claim, not on the defendant's litigation strategy." *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1531 (2013). We seem to be at the bottom of a long, steep, and icy slope and may want to consider how we got here.

For these reasons, I would affirm the district court across the board. The court seeing it otherwise on the mootness decision, I respectfully dissent from that part of its ruling.